Anthony Argiropoulos, Esq.
Sheila Woolson, Esq.
Thomas Kane, Esq.
**Epstein Becker & Green, P.C.**
150 College Road West, Suite 301
Princeton, New Jersey 08540
(609) 455-1540 (Phone)
(609) 228-5318 (Facsimile)
Attorneys for Plaintiff
Capital Health System, Inc.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CAPITAL HEALTH SYSTEM, INC.,<br><br>Plaintiff,<br><br>v.<br><br>EROL VEZNEDAROGLU, M.D., DREXEL UNIVERSITY, and GLOBAL NEUROSCIENCES INSTITUTE,<br><br>Defendants. | CIVIL ACTION NO.<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Capital Health System, Inc., ("Capital" or "Plaintiff") located at 750 Brunswick Avenue, Trenton, New Jersey and One Capital Way, Pennington, New Jersey through its counsel Epstein Becker & Green, P.C. and by way of this Complaint against Defendants Erol Veznedaroglu, M.D., Drexel University ("Drexel"), and Global Neurosciences Institute ("GNI") hereby states as follows:

**PRELIMINARY STATEMENT**

1.    This Complaint reads at times like a laundry list of Defendant Veznedaroglu's disloyal, dishonest, and unlawful conduct. He has dishonored his various agreements with his former employer, Plaintiff Capital and unlawfully competed for his own personal benefit (individually and through his company GNI) and to the unfair and unlawful benefit of his latest employer, Defendant Drexel.

2.    Capital invested tens of millions of dollars to develop the nationally recognized Capital Institute for Neurosciences (sometimes referred to as the "Institute") at its convenient and centrally-located campuses in Mercer County, New Jersey. This included entering into agreements with neurosurgeon Defendant Veznedaroglu, investing in state-of-the-art neurological and cerebrovascular care facilities, and building a team of employed physicians and staff.

3.    Motivated purely by greed and self-interest, and fueled by an unmatched megalomania, Defendant Veznedaroglu sabotaged and took the Institute's resources for himself, repackaged them as GNI and apparently sold them off to the highest bidder—Defendant Drexel University.

4.    Together now, Defendants Veznedaroglu and Drexel have destabilized and tortiously raided the Institute and they have stolen and taken hostage Capital's Transfer Hotline Telephone

Number (the "Transfer Hotline"), thereby diverting significant patient volume away from Plaintiff Capital under false, dishonest, and unlawful pretenses.

5.   Defendants subverted and destabilized Capital's relationships and contracts with its contracted and employed physicians, nurses, physician's assistants and other staff, while actively interfering with Capital's relationships with its referring and transferring physicians and hospitals. This occurred as recently as last week.

6.   Defendants Veznedaroglu and GNI also took for themselves at least three of Capital's relationships with other hospitals and Capital's relationships with its own employees.

7.   To add insult to injury, Defendants are **actively interfering** with Capital's efforts to mitigate against Defendants' unlawful and tortious conduct. For example, and specifically, Defendants sabotaged and otherwise interfered with Capital's efforts to hire Dr. Aditya S. Pandey, M.D., an endovascular neurosurgeon as a full-time neurosurgeon for Capital's patients.

8.   Defendants' scheme is clear. They have and continue to take for themselves the goodwill and assets of Capital's Institute that Capital has built at great cost, expense and investment.

9.   All of this has caused Capital to suffer immediate and irreparable harm in addition to tens of millions of dollars in damages and other losses. Capital seeks injunctive and other equitable relief as well as damages. Defendants must be stopped.

10.   Each of the Defendants has been a knowing, active, and willing participant in the scheme, and they continue to reap and keep for themselves massive economic and other benefits at Capital's direct expense.

## THE PARTIES

11.   Plaintiff Capital Health System, Inc. is a New Jersey regional, non-profit health system licensed by the New Jersey Department of Health and Human Services.  Its assets are used to benefit the public.  It has two primary campuses: Capital Health Regional Medical Center at 750 Brunswick Avenue, Trenton, New Jersey and Capital Health Medical Center - Hopewell at One Capital Way, Pennington, New Jersey. It also operates an out-patient facility in Hamilton, New Jersey. Capital is a citizen of the State of New Jersey.

12.   Defendant Erol Veznedaroglu, M.D., is a citizen of the Commonwealth of Pennsylvania, residing at 404 S. Front Street, Philadelphia, PA.

13.   Defendant Drexel University is a university headquartered at 3141 Chestnut Street, Philadelphia,

Pennsylvania. It is a citizen of the Commonwealth of Pennsylvania.

14.   Defendant Global Neurosciences Institute or "GNI" is a business entity owned by Erol Veznedaroglu, M.D., with a headquarters at 404 S. Front Street, Philadelphia, PA. It is a citizen of the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

15.   The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Capital brings claims pursuant to the Lanham Act, 15 U.S.C. § 1125. The Court has supplemental jurisdiction over Capital's state law claims pursuant to 28 U.S.C. § 1367.

16.   The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the parties are completely diverse and the amount in controversy, exclusive of interest and costs, exceeds $75,000. Specifically, Plaintiff Capital is a citizen of the State of New Jersey, and Defendants Veznedaroglu, Drexel, and GNI are citizens of the Commonwealth of Pennsylvania.

17.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Mercer County.

## FACTS COMMON TO ALL COUNTS

### Neurological and Cerebrovascular Care at Capital

18.   Since 2008, Capital has been a national leader in neurological and cerebrovascular care.

19.   In 2008, Capital opened the Capital Institute for Neurosciences (sometimes referred to as the "Institute").

20.   Capital's Institute for Neurosciences is a nationally recognized and fully accredited center for advanced neuroscience care in the Delaware Valley, drawing patients from throughout the New Jersey/Philadelphia region and beyond. The Institute's physicians and team of clinicians work to diagnose and find the most appropriate treatment for complex cerebrovascular conditions such as aneurysms and arteriovenous malformations (AVMs); brain and spinal tumors; spinal conditions including degenerative diseases, injury and vascular disorders; neurologic conditions including stroke, epilepsy, headache, Parkinson's and Alzheimer's; pediatric conditions such as developmental delays and genetic disorders and attention deficit disorders; and difficult to treat pain.

21.   Capital's Institute for Neurosciences provides patients and their families with access to a multi-disciplinary team that provides the latest techniques advancing patient care and outcomes.

22.  Capital's Institute for Neurosciences has a dedicated Neurosurgical Intensive Care Unit (Neuro ICU) and the Center for Neurologic Emergency Medicine, as well as a hybrid operating room which enables physicians to move between endovascular procedures and traditional open surgery in the same operating room.

23.  It takes years of careful planning and millions of investment dollars to build a nationally recognized Neurosciences Institute.

24.  Capital invested approximately $60 million dollars in infrastructure creating Capital's Institute for Neurosciences, including highly specialized equipment; highly trained physicians; and dedicated professional staff. As a result of this investment and commitment in Capital's Institute for Neurosciences, Plaintiff has one of the very few neuro-stroke departments in the United States.

25.  Capital's Institute for Neurosciences is also a leader in neurological research.

26.  Through Capital's Institute for Neurosciences, Capital treats patients with state-of-the-art medical devices and technology, and treatments for cerebrovascular care, including the Merci Retriever, Penumbra device and Onyx glue for aneurysms and AVMs.

27.   Capital was also the only hospital in central and southern New Jersey and Philadelphia to trial Solitaire™, a stroke device now approved by the FDA for clot removal, and the first in the country to trial an investigational device to remove blood clots in acute ischemic stroke patients, the Trevo™ device.

28.   Capital has participated in studies involving adult stem cells and spinal fusion as well as back pain.

29.   Through its commitment to excellent care and advanced research in neurological treatment and care, Capital, through Capital's Institute for Neurosciences, remains on the forefront of neurological care and treatment.

### Neurological and Cerebrovascular Care at Drexel

30.   Drexel is not a hospital.

31.   Neurological medical or surgical procedures cannot be performed at Drexel, and such procedures are not performed at Drexel.

### Capital's 24/7 Transfer Hotline

32.   In 2008, Capital secured, obtained, and established **for Capital** a toll-free 24/7 Transfer Hotline Number (the "Transfer Hotline") for cerebrovascular and neurological care. The number was obtained through Capital's direct consultation with AT&T.

33.  Capital's toll-free 24/7 Transfer Hotline is 877-867-2865.

34.  Capital owns the Transfer Hotline and Capital is billed for and pays its phone carrier for the Transfer Hotline--even today.

35.  During stroke and other adverse neurological events, it is imperative that a patient receive the appropriate treatment in less than thirty minutes.

36.  The Transfer Hotline allows physicians across New Jersey and Pennsylvania to call immediately, twenty-four hours a day, seven days a week, and be connected **directly to the neurosurgeon on call at Capital**, who will then arrange directly for the transfer of the patient to Capital.

37.  This single-call service that Capital provides is vital to patient care, particularly to any transferring physician whose patients require immediate medical or surgical intervention. It is also vital to Capital's Institute for Neurosciences's success as an advanced neuro-stroke center focused on patient care.

38.  Defendant Veznedaroglu currently serves as an on-call neurosurgeon at Capital pursuant to a written "Agreement for Professional Services: Neurosurgery On-Call Coverage" (the "On-Call Agreement").

39.  As set forth in greater detail below, and among their other unlawful conduct, Defendant Veznedaroglu and Defendant Drexel have misappropriated the Transfer Hotline.

40.  Now, when physicians call to have a patient transferred to Capital, Defendant Veznedaroglu, or persons acting at his direction or on his behalf, cause the patients to be transferred to a hospital other than Capital, and in many instances to Philadelphia. These other hospitals cannot match the level of care at Capital, because they lack Joint Commission accreditations, have lesser infrastructure, and lack state-of-the-art medical technology and facilities.

41.  Defendants' actions create an increase in travel time, delay in treatment for patients in critical condition and require them to cross state lines when the patient can receive better care at a closer and superior facility in New Jersey.

42.  This conduct is unlawful and violates various contracts between Defendant Veznedaroglu and Capital, as well as statutory and common law.

### Background of Defendant Veznedaroglu's Relationship with Capital

43.  As part of its investment in Capital's Institute for Neurosciences, in July 2008 Capital entered into a written employment contract with Defendant Veznedaroglu (the "2008 Employment Agreement").

44.   Pursuant to the 2008 Employment Agreement, Defendant Veznedaroglu's annual base salary ranged from $1.1 to $1.45 million dollars. He was also entitled to "incentive compensation" equal to 90% of the collection of professional fees above $1.45 million dollars.

45.   Capital also provided Defendant Veznedaroglu with office space to treat patients outside of the hospital in an office setting.

46.   In exchange, Defendant Veznedaroglu was to provide services exclusively to and exclusively at Capital and Capital's Institute for Neurosciences.

47.   To assist Defendant Veznedaroglu and his patients, Capital created a "Provider Number," which is a telephone number that allows patients to contact Defendant Veznedaroglu's practice directly for non-emergency situations. The Provider Number is 877-247-3443.

48.   The Provider Number is not and never was the Transfer Hotline. The Provider Number is Defendant Veznedaroglu's **office number**.

49.   By contrast, the Transfer Hotline allows for a referring/transferring physician or hospital to immediately contact the Capital on-call neurosurgeon to arrange and prepare for transfer of the patient for care at Capital.

50.   The Transfer Hotline, is just that, a phone number to call in order to arrange for the transfer of a patient to tertiary level facilities and supporting staff. Any other interpretation would disregard quality and safety and place patients at risk. The Transfer Hotline is not, was never intended to be, and cannot be Defendant Veznedaroglu's personal property.

51.   In 2011, Defendant Veznedaroglu and Capital renegotiated the terms of 2008 Employment Agreement.

52.   The renegotiated 2011 Employment Agreement was between Defendant Veznedaroglu and the Stroke and Cerebrovascular Center of New Jersey, P.C., which provides services to Capital's Institute for Neurosciences. Capital was the expressly identified and intended third-party beneficiary of the 2011 Employment Agreement.

53.   The 2011 Employment Agreement has a four-year term and was scheduled to end in June 2015.

54.   During the term of the 2011 Employment Agreement, and pursuant to Section 2.1(b) of that agreement, Defendant Veznedaroglu agreed that he "shall be a full-time employee of Employer and **shall devote his entire professional time, skill, and attention to the performance of professional services and activities on behalf of the Employer and the patients it serves** …" (emphasis added).

12

55.   Furthermore, pursuant to Section 4.1 of the 2011 Employment Agreement, Defendant Veznedaroglu promised to "devote his entire professional time, skill, and attention to the performance of professional services and activities on behalf of Employer and the patients and community it serves."

56.   Among other things, Section 7.1(c) of the 2011 Employment Agreement provides that "[f]or a period of two (2) years following the date of termination of his employment, [Defendant Veznedaroglu] shall not urge, induce, entice or in any matter whatsoever solicit other employees of Capital or Employer to leave Capital's or Employer's employ" (the "Non-Solicitation Provision").

57.   Section 7.2 of the 2011 Employment Agreement states:

> [Defendant Veznedaroglu] acknowledges that Capital is an intended third-party beneficiary of the restrictions contained in this Article Seven. Physician acknowledges that: (a) the terms contained in this Article Seven are necessary for the reasonable protection of Employer's and Capital's interests; (b) each and every covenant and restriction is reasonable in respect to its subject matter, length of time, and geographical area…

58.   Pursuant to Section 7.4 of the 2011 Employment Agreement, Capital is entitled to an injunction if Defendant Veznedaroglu breaches any of his obligations set forth in Section 7:

> The parties hereby agree that in the event of a breach or attempted breach of the provisions of this Article Seven, Employer and Capital shall suffer irreparable

13

harm and damage.  Accordingly, [Defendant Veznedaroglu] agrees that Employer and Capital shall be entitled to an injunction or restraining order against any such breach or any threatened breach by Physician, together with all additional remedies which shall be available to Employer or Capital at laws or equity.

59.  The 2011 Employment Agreement also provides that if the Agreement were terminated, Capital would facilitate the transfer of the "Provider Number" so that Defendant Veznedaroglu's patients could continue to reach his office for non-emergency situations.

60.  The 2011 Employment Agreement does not refer to, relate to, involve, or concern Capital's Transfer Hotline in any manner whatsoever. Indeed, Capital did not and could not as a matter of law agree to transfer its Transfer Hotline number as that number is for transfers to Capital's hospital, not Defendant Veznedaroglu's private practice.

### Termination of the 2011 Employment Agreement

61.  In the beginning of 2014, it became clear that Defendant Veznedaroglu and Capital were not going to renew Defendant Veznedaroglu's 2011 Employment Agreement.

62.  Prior to its expiration, Defendant Veznedaroglu requested that the 2011 Employment Agreement be terminated early so that he could expand his newly-branded medical practice "Global Neurosciences Institute" and provide care at additional medical centers.

14

63.  As an act of good faith, Capital agreed to the early termination of Defendant Veznedaroglu's exclusive 2011 Employment Agreement, but it did not authorize Defendant Veznedaroglu to divert Capital's patients, goodwill, business opportunities, Institute for Neurosciences, Transfer Hotline, or employees.

64.  Accordingly, on July 28, 2014, Capital and Defendant Veznedaroglu agreed to accelerate the expiration date of the 2011 Employment Agreement by approximately three months to March 2015.

65.  Defendant Veznedaroglu agreed to abide by the balance of the terms of the 2011 Employment Agreement and his various other agreements with Capital.

66.  Indeed, in connection with the acceleration of the 2011 Employment Agreement's expiration date, Capital advised that it

> hope[d] that Capital Health remains part of GNI's overall plan and we can create a legally appropriate relationship on a going forward basis. As a starting point, Capital Health will require call coverage as of January 24, 2015, and I hope that you and your partner[s] can provide us with this service. Any physicians and employees who are currently employed by Capital Health are free to join your practice upon the expiration of their agreement.

67.  However, unbeknownst to Capital, what appeared to be preparation for Defendant Veznedaroglu's life after the 2011 Employment Agreement, was in fact the prelude for his theft of

15

Capital's goodwill and a campaign aimed at stealing from Capital and causing it to suffer losses and harm for his personal, private benefit.

<u>**Defendants' Raid of Capital**</u>

68.  As previously set forth, Capital spent tens of millions of dollars to develop a nationally recognized neurosciences institute and facility that uses state-of-the-art technology and medical equipment to save lives and improve quality of life.

69.  Capital's Institute for Neurosciences's infrastructure alone cost Capital more than $60 million.

70.  Furthermore, Capital lawfully recruited top physicians from across the country to staff Capital's Institute for Neurosciences and to support Defendant Veznedaroglu.

71.  Assembling nationally-recognized physicians of such high caliber is extremely difficult and occurred through great expenditure of Capital's time, money, and other resources.

72.  For example, Capital recruited Ricardo Cruciani, M.D., Ph.D., a neurologist who has a subspecialty in Pain Management. Capital incurred in excess of $1 million in infrastructure, support and other costs specifically to support Dr. Cruciani, who is subject to an employment agreement with Capital.

73.  Patients receiving care at the Institute are high acuity patients, which require specially trained physician's

assistants, nurses, and other support staff. Recruitment and training of these individuals was done over the course of several years at significant cost and expense to Capital.

74.   All of this was necessary to build Capital's Institute for Neurosciences and to develop its goodwill within the relevant medical and patient communities, particularly throughout New Jersey and the Delaware Valley.

75.   Defendant Veznedaroglu's Non-Solicitation Provision contained in the 2011 Employment Agreement is important because it is aimed to prevent him from raiding Capital's Institute for Neurosciences and to protect Capital's goodwill and investment in its Institute.

76.   At all times material to the facts pleaded in this Complaint, Defendant Drexel has been aware and on notice of Defendant Veznedaroglu's agreements with Capital, including the 2011 Employment Agreement (and its Non-Solicitation Provision) and the On-Call Agreement.

77.   Nevertheless, despite Defendant Veznedaroglu's affirmative obligations and Defendant Drexel's knowledge of those obligations, Defendants Veznedaroglu and Drexel have unlawfully and maliciously destabilized and raided Capital's Institute for Neurosciences.

78.   Defendant Veznedaroglu solicited some, if not all, of Capital's neurologists through various improper methods

including, but not limited to, unauthorized staff meetings where he assembled Capital employed clinicians and practitioners without the approval of Capital.

79. Thus far, with Defendant Drexel's knowledge, consent, and active participation, and directly and squarely in violation of his obligations to Capital, and in bad faith Defendant Veznedaroglu has interfered with Capital's relationships and contracts and successfully solicited and induced at least five doctors to terminate their relationships with Capital and leave Capital to join him and Drexel—Peter Gliebus, M.D., Kate Lester, Ph.D., Michelle Dougherty, M.D., Jill Farmer, M.D., and Ricardo Cruciani, M.D., Ph.D.

80. **As recently as November 17, 2015**, Dr. Cruciani informed Capital that he is terminating his contract and leaving Capital to join Defendants Veznedaroglu and Drexel as Drexel's Chairman of Neurology.

81. At all times material to this Complaint, Defendants Veznedaroglu and Drexel were aware and on notice that the foregoing physicians were under contract with Capital.

82. In order to successfully solicit the foregoing physicians, Defendants Veznedaroglu and Drexel used confidential information that Defendant Veznedaroglu improperly and unlawfully accessed and took for his own personal and unlawful

18

use while he was employed by Capital. This includes the physicians' employment agreements.

83.   Defendant Veznedaroglu accessed Capital's employment agreements with its physicians to learn the economic and other terms of their employment with Capital. He then provided that information to Defendant Drexel to materially assist in the unlawful recruitment of those physicians.

84.   Upon information and belief, Defendant Drexel did not advertise or otherwise independently seek physicians for its neurology program. Instead, Defendant Drexel specifically intended to raid Capital, and Defendant Veznedaroglu led the raid.

85.   As recent as last month, Defendant Veznedaroglu called an emergency staff meeting with Capital staff, during business hours at Capital's facilities, to solicit staff to leave Capital's employ. In total, Defendants Drexel and Veznedaroglu poached and improperly interfered with the contracts of at least nine (9) neurological professionals and several other clinical practitioners from Capital's staff, most within the last month.

86.   In addition to stealing Capital's neurology program, Defendants Drexel and Veznedaroglu have also stolen Capital's Transfer Hotline and created confusion among consumers of Capital's services.

## **Defendants' Theft of the Transfer Hotline**

87.   Notwithstanding the early, negotiated termination of Defendant Veznedaroglu's term of employment pursuant to the 2011 Employment Agreement, Defendant Veznedaroglu and Capital continue to be parties to a written "Agreement for Professional Services: Neuro-Surgery On-Call Coverage" (the "On-Call Agreement").

88.   The On-Call Agreement commenced in March 2015, and intentionally coincided with the conclusion Defendant Veznedaroglu's 2011 Employment Agreement and it continues to be effective through February 16, 2016.

89.   Pursuant to the On-Call Agreement, Capital and Defendant Veznedaroglu agreed that he would provide endovascular neurosurgical on-call and rounding coverage for Capital patients on an as-needed basis, and Capital specifically engaged Defendant Veznedaroglu to provide services to Capital.

90.   Among other things, the On-Call Agreement provides that:

> In accordance with the terms and conditions of this Agreement, Provider [i.e., Defendant Veznedaroglu] shall provide [Capital] with the following services (collectively, the "Services"):
>
>> a. Be on-call and available to Capital for the provision of inpatient rounding and call coverage of Capital Health patients on an as-needed basis for twenty-four periods, as assigned to Provider by Capital Health ("Coverage Period").

      b. Provide 24-hour call coverage for all clinical patient neurosurgical trauma, and stroke care events during the Coverage Period.

      c. Ensure Provider has back-up coverage for any Coverage Period he/she is assigned to ensure prompt provision of the Services. Provider shall ensure any physician providing back-up coverage pursuant to this Section 1(c) maintains the same or higher level of qualifications as required of Provider under this Agreement.

      d. During any and all available Coverage Period(s), no other provider will provide the Services, unless in accordance with Section 1(c)(requiring Provider to arrange back-up coverage) or as mutually agreed otherwise by the Parties.  This exclusivity shall apply prospectively and shall not apply to dual trained endovascular neurosurgeons who are credentialed by Capital Health prior to March 15, 2015.

91. Defendant Veznedaroglu remains the on-call neurosurgeon at Capital and on Capital's medical staff pursuant to the On-Call Agreement.

92.  When calls come to the Transfer Hotline, those calls are directed to his cell phone, or the cell phone of the physician providing coverage for Capital, so that the physician may arrange for the prompt and efficient transfer of patients from transferring hospitals to Capital.

93.  Calls for transfers have in fact come to the Transfer Hotline, and those calls have been directed to Defendant Veznedaroglu in his capacity as Capital's on-call neurosurgeon.

94.  However, Defendant Veznedaroglu has failed to accommodate or arrange for the transfer of patients to Capital.

95.  Instead, Defendant Veznedaroglu is re-routing and transferring patients to hospitals outside of New Jersey for treatment by Drexel's Neurosciences Institute.

96.  For the last seven years, Capital's Transfer Hotline has been placed on stickers and affixed to emergency room telephones at non-Capital hospitals for easy access to Capital's Institute for Neurosciences and on-call cerebrovascular and neurological surgeons.  A true and accurate copy of Capital's Transfer Hotline sticker is attached hereto as Exhibit A.

97.  The sticker was created and designed by Capital, and Capital owns every aspect of it and uses it in commerce.

98.  In late October 2015, Capital learned that Defendant Veznedaroglu and Drexel had taken Capital's Transfer Hotline and advertised it on a sticker for the Drexel Neurosciences Institute.  A true and accurate copy of the sticker used by Drexel is attached hereto as Exhibit B.

99.  Not only did Defendants Drexel and Veznedaroglu take Capital's Transfer Hotline—the sticker that they created for Drexel's so-called Neurosciences Institute looked confusingly

22

similar to Capital's sticker—it was identical practically word-for-word and in every other material respect.

100. Capital did not authorize Defendants to copy its design or to use Capital's property or telephone number to promote or conduct non-Capital business.

101. Defendants Drexel and Veznedaroglu have otherwise publicly advertised Capital's Transfer Hotline as Drexel's 24/7 Transfer Hotline in print and other media.

102. Defendants no doubt intended to confuse physicians into thinking that the Drexel's Neurosciences Institute was the same as Capital's Institute for Neurosciences and could provide the same level and quality of services to patients.

103. This, of course, is false. For seven years, when a physician called Capital's Transfer Hotline, the physician knew that the patient was going to be transferred to Capital and treated at Capital's facilities.

104. Furthermore, for seven years, when a patient was transferred following a call to Capital's Transfer Hotline, the patient would be transferred to Capital and treated at Capital's state-of-the-art facilities.

105. Now, when a physician calls the Capital Transfer Hotline number, the patient is transferred to another hospital that is not Capital—but certainly not to Drexel, which has no emergency room facilities, no surgical facilities, and no

hospital. Without question, Drexel clearly does not have any facility that can compare to Capital's state-of-the-art facilities.

106. As a result of the Defendants' misappropriation of Capital's Transfer Hotline number, they have diverted emergency room physicians and patients away from Capital and to the hospitals with which the Defendants have affiliations.

**Defendant Veznedaroglu's Interference and
Competition with Capital During His Employment With Capital**

107. It has been recently uncovered and discovered that Defendant Veznedaroglu began competing with Capital prior to the early termination of his employment, i.e., March 2015.

108. For example, by no later than May 13, 2014, Defendant Veznedaroglu unlawfully misappropriated Capital's print and other media that promoted Capital's Institute for Neurosciences, and he altered it so that it would identify GNI.

109. Defendant Veznedaroglu also took the phone stickers that Capital had created and used for several years and replaced Capital's name with "Global Neurosciences Institute."

110. This created significant confusion among regional hospitals who were "very confused" according to emails exchanged among Defendant Veznedaroglu and his agents, and representatives informed these "very confused" hospitals that GNI is "all one

and the same" as Capital's Institute for Neurosciences. This was a lie.

111. Furthermore, prior to the termination of the 2011 Employment Agreement, and according to his own emails, Defendant Veznedaroglu and his agents and representatives canvassed virtually every regional hospital's emergency department and were actively competing with Capital.

112. Again, according to Defendant Veznedaroglu's own emails, prior to the termination of his 2011 Employment Agreement, he lied and actively marketed these hospitals for business "with directions, candy, jars, pen lights, magnets, phone labels and donuts" and other written materials and representations.

113. According to emails dated June 3, 2014, when Virtua requested "more Capital Health brochures with directions," Defendant Veznedaroglu caused his agents and representatives to provide Virtua with information regarding his competitive entity—GNI. His agents and representatives stated "You'll see that the 877 number is the same as everything else about the solid relationship Virtua has with Capital Health."

114. Clearly, Defendant Veznedaroglu was trading on Capital's goodwill and intentionally creating confusion in the client marketplace.

## Other Breaches and Interference

115. Defendant Veznedaroglu, acting individually and on behalf of GNI, breached his 2011 Employment Agreement and tortiously interfered with Capital's contractual relationships with other hospitals, including but not limited to Our Lady of Lourdes ("Lourdes").

116. During the term of Defendant Veznedaroglu's 2011 Employment Agreement, Capital and Lourdes were parties to a Neuroscience Network Agreement, pursuant to which Capital provided full service neurological and spinal services.

117. Defendant Veznedaroglu violated the 2011 Employment Agreement and his other legal obligations to Capital by maliciously interfering with and misappropriating Capital's relationship with Lourdes, and by taking for himself and GNI Capital's opportunity and relationship with Lourdes.

118. Specifically, Defendants Veznedaroglu and GNI directly contracted with Lourdes to provide neurological and related services and caused the non-renewal and termination of the relationship between Lourdes and Capital, thus causing economic harm to Capital.

119. Defendant Veznedaroglu's foregoing conduct with respect to Lourdes occurred while he was employed by Capital.

120. Capital had a Neuroscience Affiliation and Network Agreement with Aria Health, during Defendant Veznedaroglu's

26

employment with Capital, through which Defendant Veznedaroglu provided services to Aria Health on behalf of Capital.

121. Again, Defendant Veznedaroglu violated the 2011 Employment Agreement and his other legal obligations to Capital by maliciously interfering with and misappropriating Capital's relationship with Aria Health, and by taking for himself and GNI Capital's opportunity and relationship with Aria Health.

122.  Additionally, Defendant Veznedaroglu unlawfully solicited two physician's assistants employed by Capital to work at Aria Health during the time that his 2011 Employment Agreement was in effect—these Capital employees are Hetal Patel and Randy Faber.

123. As a result of Defendant Veznedaroglu's breach of the 2011 Employment Agreement and otherwise unlawful interference, Capital lost its agreement and relationship with Aria Health and was damaged.

### Defendants' Conduct has Substantially Damaged and Irreparably Harmed Capital

124. Capital has invested more than $60 million to develop Capital's Institute for Neurosciences and its goodwill.

125. Capital invested in excess of $10 million to support Defendant Veznedaroglu's practice at Capital. While Capital was investing millions of dollars in exchange for Defendant Veznedaroglu's performance, loyalty, and fidelity pursuant to

the 2011 Employment Agreement, he was self-dealing, disloyal, and actively competing against Capital and sabotaging Capital's relationships with other hospitals and its other employees.

126. Defendants' interference with Capital's relationships with contracted physicians has caused and will cause Capital to suffer damages in excess of another $10 million.

127. Defendants' interference with Capital's relationships with its contracted physicians, has further damaged Capital by causing Capital to renegotiate contracts and fend off Defendants' unrelenting malicious, tortious, and otherwise unlawful conduct.

128. Defendant Veznedaroglu's unlawful subversion and diversion of patients in violation of the 2011 Employment Agreement and the On-Call Agreement, his common law obligations, and otherwise have damaged Capital by millions of dollars in lost revenues and acted to nullify Capital's investment in the Capital Institute for Neurosciences.

129. Furthermore, and among other things, and without limitation, Defendants' unlawful taking, misbranding, and misuse of Capital's Transfer Hotline has caused a decrease in transfers to Capital of over thirty percent (30%) as reflected in Figure 1 below.

Figure 1



130. Defendants' foregoing malicious, unlawful, knowing, and intentional misconduct destroyed or otherwise irreparably harmed Capital's goodwill and investments.

131. At all times material to the allegations of this Complaint, Defendants' conduct was willful, wanton, and egregious.

**Count I**
**(All Defendants)**
**<u>False Advertising——Lanham Act</u>**

132. Capital repeats and realleges all of the allegations set forth in the preceding paragraphs as if set forth in full.

133. Defendants have engaged in unfair and unlawful activity in an effort to divert business and potential business from Capital to Defendants.

134. They have used in commerce words and symbols designed to confuse physicians and patients into believing that there is affiliation, connection or association between Capital's Institute for Neurosciences and Drexel's Neurosciences Institute.

135. Defendants' statements and dissemination of this material deceived and/or had the tendency to deceive customers and/or potential customers (i.e., physicians and patients) of Capital and Defendants.

136. Defendants disseminated these words and symbols to interstate customers and/or potential customers.

137. Defendants have also in commercial advertising and promotion misrepresented the nature, characteristics and qualities of the services they offer because unlike Capital, Drexel has no emergency room, no hospital and cannot provide the neurological care that Capital provides.

138. The acts of Defendants in marketing, promoting and purportedly comparing their current services and business to that of Capital, while making demonstrably false and misleading statements, has caused and is likely to continue to cause confusion, mistake and/or deception as to the current operations

and reputation of Capital, all in violation of Section 43(a)(1)(A) and (B) of the Lanham Act.

139. Defendants' false comparisons to Capital and its services will continue to cause disparagement and dilution of Capital's goodwill.

140. Defendants' on-going acts in violation of Section 43(a)(1)(A) and (B) are malicious, willful and deliberate and have inflicted and will continue to inflict substantial damages and irreparable harm on Capital.

**Count II**
**(Defendant Veznedaroglu)**
**Breach of the 2011 Employment Agreement**

141. Capital repeats and realleges all of the allegations set forth in the preceding paragraphs as if set forth in full.

142. Defendant Veznedaroglu's 2011 Employment Agreement contained a valid and enforceable Non-Solicitation Provision.

143. In complete and willful violation of the Non-Solicitation Provision, Defendant Veznedaroglu solicited Capital's staff to leave Capital and to work at or for other hospitals.

144. Defendant Veznedaroglu misappropriated Capital's confidential business information, i.e., the terms and conditions of employment for its neurological professionals, and provided the same to Capital's competitors, including Drexel, to ensure that those competitors could match or improve upon

31

Capital's terms and conditions of employment, thus ensuring that Defendant Veznedaroglu's solicitation was successful.

145. As the intended third-party beneficiary to the 2011 Employment Agreement and the Non-Solicitation Provision, Capital has the right to enforce both.

146. As a direct result of Defendant Veznedaroglu's actions, Capital has suffered irreparable harm and substantial damages.

**Count III**
**(Defendant Veznedaroglu)**
**Breach of the On-Call Agreement**

147. Capital repeats and realleges all of the allegations set forth in the preceding paragraphs as if set forth in full.

148. Through his foregoing unlawful conduct, Defendant Veznedaroglu has materially breached the On-Call Agreement and deprived Capital of its contractual rights pursuant to the On-Call Agreement.

149. Through his foregoing unlawful conduct, Defendant Veznedaroglu has caused Capital to suffer substantial damages and irreparable harm.

**Count IV**
**(Defendant Veznedaroglu)**
**Breach of Implied Covenants of Good Faith and Fair Dealing**

150. Capital repeats and realleges all of the allegations set forth in the preceding paragraphs as if set forth in full.

151. The 2011 Employment Agreement and the On-Call Agreement contain implied covenants of good faith and fair dealing.

152. Through his foregoing unlawful conduct, Defendant Veznedaroglu has materially breached the implied covenants of good faith and fair dealing and deprived Capital of the benefit of its bargain with him.

153. Through his foregoing unlawful conduct, Defendant Veznedaroglu has caused Capital to suffer substantial damages and irreparable harm.

### Count V
### (Defendant Veznedaroglu)
### <u>Disloyalty</u>

154. Capital repeats and realleges all of the allegations set forth in the preceding paragraphs as if set forth in full.

155. Defendant Veznedaroglu owed Capital a common law duty of loyalty during his employment by Capital.

156.  Defendant Veznedaroglu was further obligated to perform his job to the best of his ability and to take action to provide the best possible result for Capital in accordance with his obligations under the 2011 Employment Agreement.

157. Through his foregoing unlawful conduct, Defendant Veznedaroglu intentionally, maliciously, for his own selfish reasons and without justification, breached his duty of loyalty to Capital by (a) competing against Capital during his

employment; (b) stealing Capital's property during his employment; (c) redirecting patients to other hospitals that came through Capital's Transfer Hotline during his employment; (d) failing to respond to calls from the Transfer Hotline number as required; (e) raiding Capital's professional neurological staff and misusing Capital's confidential business information to compete with it during his employment. In the meantime, Capital was paying millions of dollars to Defendant Veznedaroglu in reliance upon his employment agreements, loyalty, and fidelity.

158. By his disloyal actions, Defendant Veznedaroglu materially breached his duty of loyalty to Capital, and caused Capital to suffer substantial damages and irreparable harm.

159. By reason of the foregoing, Capital is entitled to compensatory and punitive damages in an amount to be determined at trial as well as recovery of all compensation paid to and expenses reimbursed to Defendant Veznedaroglu as well as all sums spent on the infrastructure, support staff, and other expenditures for Defendant Veznedaroglu's benefit.

**Count VI**
**(All Defendants)**
**Unfair Competition**

160. Capital repeats and realleges all of the allegations set forth in the preceding paragraphs as if set forth in full.

161. Through their foregoing unlawful conduct, Defendants have competed unfairly with Capital.

162. Among other unlawful conduct, Defendants have misappropriated Capital's confidential business information and used it to solicit Capital's neurological professionals and take for themselves at little cost and no investment, the goodwill and assets of the Capital Institute for Neurosciences, that Capital built at great cost and significant investment.

163. Defendants have unlawfully misappropriated, exercised dominion over, and knowingly and intentionally misused Capital's Transfer Hotline and diverted patients and referring/transferring physicians and hospitals away from Capital.

164. Defendants are unlawfully trading off of Capital's reputation and brand.

165. Defendants have created confusion in the marketplace through their unlawful, intentional, and wrongful misuse of Capital's Transfer Hotline.

166. As a direct result of Defendants' unfair competition, Capital has suffered substantial damages and irreparable harm.

**Count VII**
**(All Defendants)**
**Tortious Interference with**
**Prospective Economic Advantage and Contract**

167. Capital repeats and realleges all of the allegations set forth in the preceding paragraphs as if set forth in full.

168. At all times material to the facts pleaded in this Complaint, Capital had a reasonable expectation of economic advantage through its actual and prospective relationships with referring/transferring emergency room physicians and hospitals, with its patients, and with other hospitals for whom Capital provided services pursuant to network or other agreements.

169. At all times material to the facts pleaded in this Complaint, Capital had a reasonable expectation of economic advantage in its relationship and contracts with its employed physicians, nurses, and other staff.

170. At all times material to the facts pleaded in this Complaint, Defendants had actual knowledge and notice of Capital's foregoing reasonable expectation of economic advantage and contracts.

171. Defendants have taken unlawful, unjustified and malicious action to interfere with, divert, and destabilize Capital's actual and prospective expectations of economic advantage and its contractual relationships.

172. As a direct result of Defendants' malicious, unjustified and unlawful interference and tampering, Plaintiff's foregoing actual and prospective relationships, economic advantage, and contracts, have been damaged or destroyed.

173. Consequently, Capital has suffered and continues to suffer substantial damages and irreparable harm.

### Count VIII
### (All Defendants)
### <u>Conversion</u>

174. Capital repeats and realleges all of the allegations set forth in the preceding paragraphs as if set forth in full.

175. Capital has an ownership and possessory interest in its Transfer Hotline.

176. Defendants intentionally, improperly and unlawfully exercised dominion and control over the Transfer Hotline.

177. Such actions are inconsistent with Capital's rights to the Transfer Hotline.

178. Consequently, Capital has suffered and continues to suffer substantial damages and irreparable harm.

### Count IX
### (Defendant Drexel)
### <u>Tortious Interference With Contract</u>

179. Capital repeats and realleges all of the allegations set forth in the preceding paragraphs as if set forth in full.

180. At all times relevant, Defendant Veznedaroglu was contractually obligated to not solicit Capital's employees

pursuant to the 2011 Employment Agreement. He is also expressly obligated to take calls from the Transfer Hotline **for Capital, and not Drexel**, pursuant to the On-Call Agreement.

181. Defendant Drexel willfully and maliciously interfered with the 2011 Employment Agreement and On-Call Agreement.

182. Defendant Drexel's unlawful interference with the 2011 Employment Agreement and on-Call Agreement has caused, and will continue to cause, Capital to suffer substantial monetary damages and irreparable harm.

### Count X
### (All Defendants)
### Conspiracy to Commit Tort

183. Capital repeats and realleges all of the allegations set forth in the preceding paragraphs as if set forth in full.

184. Drexel, Defendant Veznedaroglu, and GNI entered into a real agreement with a common design to perpetuate a tort or torts against Capital.

185. The purpose of this agreement was unlawful and was to cause harm to Capital.

186. Defendants have taken real, overt and tortious acts in furtherance of their agreement.

187. As a direct and proximate result of these actions by Defendants, Capital has suffered damages and irreparable harm.

## Count XI
## (All Defendants)
## <u>Unjust Enrichment</u>

188. Capital repeats and realleges all of the allegations set forth in the preceding paragraphs as if set forth in full.

189. Through Defendants' foregoing unlawful conduct, Defendants have been unjustly and unfairly conferred economic and other benefits at Capital's expense and harm.

190. Defendants should be ordered to repay and compensate Capital for all such unjust and unfair benefits.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, jointly, severally, and in the alternative, the following relief:

    a. Restraining and enjoining Defendants from continuing to use Capital's Transfer Hotline number for their own benefit;

    b. Requiring Defendants to immediately cease, desist, discontinue all advertising, marketing, promoting, or selling through or with any reference to Capital's Transfer Hotline number;

    c. Requiring and enjoining Defendants to immediately cease, desist, discontinue all advertising, marketing, promoting, or selling through that which appears similar to Capital's advertising, marketing, promoting

39

or selling of Capital's Institute for Neurosciences
even if it does not contain the Transfer Hotline
number;

d. Restraining and enjoining Defendants from engaging in
any conduct to unlawfully disparage Capital's
reputation or services;

e. Requiring Defendants to account for revenues and
profits received through their use of Capital's
Transfer Hotline number;

f. Requiring Defendants to account for all patients that
they have treated as a result of Defendants use of
Capital's Transfer Hotline number;

g. Compensatory damages in excess of $80 million;

h. Punitive damages;

i. Prejudgment and post judgment interest; and

j. Such other relief as this Court deems equitable and
just.

**EPSTEIN BECKER & GREEN, P.C.**
Attorneys for Plaintiff
Capital Health System, Inc.

By:   /s/Anthony Argiropoulos
ANTHONY ARGIROPOULOS
SHEILA WOOLSON
THOMAS KANE
150 College Road West
Suite 301
Princeton, NJ 088540
(609) 455-1540

Dated: November 24, 2015

## DEMAND FOR JURY TRIAL

Plaintiff Capital Health System, Inc., hereby demands a jury trial on all issues so triable.

EPSTEIN BECKER & GREEN, P.C.
Attorneys for Plaintiff
Capital Health System, Inc.

By:   /s/Anthony Argiropoulos
ANTHONY ARGIROPOULOS
SHEILA WOOLSON
THOMAS KANE
150 College Road West
Suite 301
Princeton, NJ 088540
(609) 455-1540

Dated: November 24, 2015

## CERTIFICATION PURSUANT TO LOCAL RULE 11.2

I hereby certify that the matter in controversy is not the subject of any action pending in this court or any other court, arbitration or administrative proceeding.

EPSTEIN BECKER & GREEN, P.C.
Attorneys for Plaintiff
Capital Health System, Inc.

By:   /s/Anthony Argiropoulos
          ANTHONY ARGIROPOULOS
          SHEILA WOOLSON
          THOMAS KANE
          150 College Road West
          Suite 301
          Princeton, NJ 088540
          (609) 455-1540

Dated: November 24, 2015