**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

CAPITAL HEALTH SYSTEM, INC.,

      Plaintiff,

      v.

EROL VEZNEDAROGLU, M.D., et al.,

      Defendants.

GLOBAL NEUROSCIENCES INSTITUTE, LLC, et al.,

      Plaintiffs,

      v.

CAPITAL HEALTH SYSTEM, INC., et al.,

      Defendants.

Civil Action No. 15-8288 (MAS) (LHG)

**MEMORANDUM OPINION**

Civil Action No. 16-1972 (MAS) (LHG)
(Consolidated with No. 15-8288)

**SHIPP, District Judge**

      This matter comes before the Court upon four Motions to Dismiss regarding two consolidated actions: *Capital Health System, Inc. v. Veznedaroglu, M.D., et al*, 15-cv-8288 (D.N.J. Nov. 24, 2015) ("2015 Action"); and *Global Neurosciences Institute, LLC, et al. v. Capital Health System, Inc., et al.*, 16-cv-1972 (D.N.J. Apr. 8, 2016) ("2016 Action"). Two of the four motions to dismiss are brought by the defendants in the 2015 Action: Erol Veznedaroglu, M.D. ("Dr. Veznedaroglu"), Drexel University ("Drexel"), Global Neurosciences Institute ("GNI"), Dr. Kenneth Liebman ("Dr. Liebman"), Dr. Zakara Hakma ("Dr. Hakma"), Dr. Mandy Binning ("Dr. Binning"), Dr. Gerald Eckhardt ("Dr. Eckhardt"), and Dr. Vikas Rao ("Dr. Rao") (collectively,

"2015 Defendants"). The first motion is brought by Drexel. (ECF No. 104.) The 2015 Plaintiff Capital Health System, Inc. ("Capital Health" or "2015 Plaintiff") opposed (ECF No. 112), and Drexel replied (ECF No. 119). The second motion to dismiss the 2015 Action is brought by GNI, Dr. Veznedaroglu, Dr. Eckhardt, and Dr. Rao (collectively, "GNI Defendants"). (ECF No. 107.) Capital Health opposed (ECF No. 111), and the GNI Defendants replied (ECF No. 122).

Simultaneously, the defendants in the 2016 Action, Alireza Maghazehe, PhD, FACHE ("Dr. Maghazehe"), Capital Health, and Stroke and Cerebrovascular Center of New Jersey, P.C. ("SCCNJ") (collectively, "2016 Defendants") brought the remaining two motions to dismiss the 2016 Complaint. The first motion is brought by Dr. Maghazehe. (ECF No. 105.) The 2016 Plaintiffs GNI, Dr. Veznedaroglu, Dr. Liebman, Dr. Binning, and Dr. Hakma (collectively, "2016 Plaintiffs") opposed (ECF No. 113), and Dr. Maghazehe replied (ECF No. 120). The second motion is brought by the 2016 Defendants Capital Health and SCCNJ (collectively, "Capital Health Defendants"). (ECF No. 106.) The 2016 Plaintiffs opposed (ECF No. 114), and the Capital Health Defendants replied (ECF No. 121).

The Court has carefully considered the parties' submissions and decides the motions without oral argument pursuant to Local Civil Rule 78.1. For the reasons stated below, the 2015 Defendants' Motions to Dismiss are **GRANTED** in part and **DENIED** in part and the 2016 Defendants' Motions to Dismiss are **GRANTED** in part and **DENIED** in part.

I.   **Background**

A.   **The 2015 Action**[1]

Capital Health "is a New Jersey regional, non-profit health system licensed by the New Jersey Department of Health and Human Services." (2015 2d Am. Compl. ¶ 16, ECF No. 101.) Capital Health operates a nationally recognized neuroscience institute that draws patients from New Jersey and Pennsylvania. (*Id.* ¶¶ 24-35.)  In 2008, Capital Health obtained a toll-free number from AT&T, which Capital Health called the Transfer Hotline or the Transfer Hotline Number ("Transfer Hotline"). (*Id.* ¶ 38.)  To date, Capital Health owns and pays for the Transfer Hotline. (*Id.* ¶ 40.)  The Transfer Hotline enables physicians in New Jersey and Pennsylvania to contact an on-call Capital Health neurosurgeon who can transfer the patient to Capital Health. (*Id.* ¶ 42.)  Dr. Veznedaroglu, Dr. Liebman, Dr. Hakma, and Dr. Binning were formerly on-call neurosurgeons at Capital Health pursuant to written on-call agreements outlining the terms of their arrangements. (*Id.* ¶ 44.)

Dr. Veznedaroglu, in particular, was a neurosurgeon at Capital Health who entered into an employment agreement with Capital Health in 2008, which was later renegotiated in 2011. (*Id.* ¶¶ 49, 57.)  In addition to a nonsolicitation provision, the employment agreement stated that Capital Health would facilitate the transfer of the Provider Number upon termination of the agreement with Dr. Veznedaroglu. (*Id.* ¶¶ 62, 65.)  During Dr. Veznedaroglu's tenure with Capital Health, Capital Health created a telephone number ("Provider Number") to enable patients to contact Dr. Veznedaroglu in non-emergent situations. (*Id.* ¶ 53.)  The Provider Number was a separate number from the Transfer Hotline. (*Id.* ¶ 54.)

---

[1] In light of Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court sets forth the factual allegations as averred in the Second Amended Complaint of the 2015 Action and assumes them to be true.

Around 2014, Dr. Veznedaroglu and Capital Health decided to terminate Dr. Veznedaroglu's employment agreement so that Dr. Veznedaroglu and other physicians could create a new medical practice called GNI. (*Id.* ¶¶ 67-68.) After the agreement was terminated, Capital Health alleged that Dr. Veznedaroglu, along with Drexel, began to use improper means to access confidential information from Capital Health, violated the nonsolicitation provision by interfering with various contracts of which Capital Health was a party, and "stole[]" the Transfer Hotline. (*Id.* ¶¶ 86-92.)

Further, Drexel's website allegedly misrepresented that Drexel has a neurosurgery practice location at Capital Health. (*Id.* ¶ 93.) Drexel's website also listed some of its physicians as being associated with Capital Health when in fact this association was nonexistent. (*Id.* ¶ 97.) Additionally, Drexel began putting the Transfer Hotline number on its own advertisement stickers. (*Id.* ¶ 100.) As a result of Drexel's conduct, Capital Health alleges that patients and physicians were confused and misled into believing there was an association between Drexel and Capital Health, thereby diverting physicians and patients away from Capital Health. (*Id.* ¶¶ 98, 106, 110.) In response to the alleged conduct, Capital Health filed the 2015 Action.

**B.     The 2016 Action**[2]

In response to the 2015 Action, the 2016 Plaintiffs filed the 2016 Action alleging that the 2016 Defendants engaged in a broad and systematic scheme to steal and misappropriate the 2016 Plaintiffs' neurosurgery practice because the 2016 Defendants are afraid of losing control of the financial benefit of the 2016 Plaintiffs' practice. (2016 Compl., ECF No. 1.)

---

[2] In light of Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court sets forth the factual allegations as averred in the Complaint of the 2016 Action and assumes them to be true.

In 2008, Dr. Maghazehe recruited Dr. Veznedaroglu and Dr. Liebman to join Capital Health. (*Id.* ¶ 22.)   During their tenure, Dr. Veznedaroglu and Dr. Liebman recruited twenty physicians, including Dr. Binning and Dr. Hakma, to also join Capital Health (Dr. Veznedaroglu, Dr. Liebman, Dr. Binning, and Dr. Hakma are collectively, the "GNI Physicians"). (*Id.*)   When Dr. Veznedaroglu joined Capital Health, "he requested that Capital Health establish a toll-free physician-to-physician hotline telephone number to enable physicians" with cases that might require complex neurosurgery services to have instant access to Dr. Veznedaroglu or one of his colleagues. (*Id.* ¶ 25.)   "In response to his request, Capital Health established a hotline" ("Transfer Hotline"). (*Id.*)   For the past seven years, physicians have connected with Dr. Veznedaroglu and his neurosurgeon colleagues by using the Transfer Hotline. (*Id.* ¶ 27.)

In 2011, Dr. Veznedaroglu and Dr. Liebman "entered into new employment agreements with SCCNJ, a captive physician entity affiliated and controlled by [Capital Health]." (*Id.* ¶ 28.) While negotiating his new employment agreement, Dr. Veznedaroglu requested that when the new employment agreement ended, the Transfer Hotline be transferred to him. (*Id.* ¶ 29.)   Capital Health and SCCNJ agreed to Dr. Veznedaroglu's request. (*Id.* ¶ 31.)   Specifically, Section 5.14 of the Employment Agreement states: "In the event of termination [Capital Health] shall facilitate the transfer of the existing Provider hotline number to Physician in a manner which complies with federal and state law." (*Id.*)

Since 2011, however, Capital Health's "neuro-program" has begun to lose referrals. (*Id.* ¶ 36.)   In response, Dr. Veznedaroglu proposed the formation of an independent medical practice to "service multiple health care systems and offer care to a broad[] spectrum of patients." (*Id.* ¶ 38.)   The proposed entity would become GNI. (*Id.*)   In January 2014, Capital Health entered into a Confidentiality and Nondisclosure Agreement to facilitate meetings between Dr.

Maghazehe, the chief executive officers of other area hospitals, and GNI. (*Id.* ¶ 40.) Additionally, Capital Health and GNI discussed a co-management agreement to permit Capital Health and GNI to manage Capital Health's "neuro-program" jointly. (*Id.* ¶ 44.) The 2016 Plaintiffs allege, however, that while Dr. Maghazehe supported the formation of GNI and its negotiations with other hospitals, he had also begun a campaign through Capital Health "to divide and conquer the GNI Physicians, starting with GNI leaders—Dr. Vez[nedaroglu] and [Dr.] Liebman." (*Id.* ¶¶ 44, 49.)

On July 28, 2014, Dr. Maghazehe gave Dr. Veznedaroglu and Dr. Liebman 180 days' notice to terminate their 2011 employment agreements, and waived their non-compete agreements. (*Id.* ¶ 50.) Dr. Maghazehe, however, did not give termination notices to fellow GNI physicians, Dr. Binning and Dr. Hakma. (*Id.* ¶ 52.) On or about October 2, 2014, suspicious that Dr. Maghazehe was trying to divide the GNI Physicians, Dr. Veznedaroglu delivered correspondence from Dr. Binning and Dr. Hakma to Dr. Maghazehe, "giving notice of termination of their employment agreements" to coincide with Dr. Veznedaroglu and Dr. Liebman. (*Id.* ¶ 53.) Capital Health agreed, but refused to waive the non-compete provisions for Dr. Binning and Dr. Hakma. (*Id.* ¶ 54.)

"In January 2015, [Capital Health] advised that it no longer wished to pursue a co-management agreement with GNI." (*Id.* ¶ 57.) Instead, Capital Health "entered into individual agreements with each of the GNI Physicians for on-call services (the 'On-Call Agreements')." (*Id.* ¶ 58.) Per the agreements, each neurosurgeon would be "on-call" and available to Capital Health for in-patient rounding and call coverage of Capital Health patients on an as-needed basis. (*Id.*)

"[C]oincident with the transition of the GNI Physicians from employees to contractors employed by GNI, [Capital Health] and GNI entered into a Space and Support Personnel Rental and Session Agreement (the 'Space and Support Agreement')." (*Id.* ¶ 59.) "Pursuant to this

agreement, GNI leased certain facilities and personnel at [Capital Health] locations so that the GNI Physicians could have a home base for their operations . . . ." (*Id.*) On March 11, 2015, GNI met with Capital Health's telecommunications group regarding the transition of the GNI Physicians' cellphones and the Transfer Hotline to a new GNI account that GNI could manage. (*Id.* ¶ 61.) GNI and Capital Health agreed that because it would take longer to transition Dr. Veznedaroglu's Transfer Hotline than the cellphones, GNI would pay $536 per month for the Transfer Hotline until the integration was complete. (*Id.* ¶¶ 61-62.)

In June 2015, Capital Health and Verizon began exchanging e-mail messages regarding the process of transferring ownership of the Transfer Hotline from Capital Health to GNI. (*Id.* ¶ 63.) Verizon supplied a Transfer of Service Agreement, later signed on behalf of Capital Health and GNI. (*Id.* ¶ 64.) Additional delays ensued, however, and Verizon required a newly executed transfer agreement. (*Id.* ¶ 65.) By November 12, 2015, Capital Health did not execute this new agreement and instead wanted revisions made to the Hotline Transfer of Service Agreement. (*Id.* ¶ 66.) Shortly thereafter, Capital Health canceled the request to transfer the Transfer Hotline to GNI. (*Id.* ¶ 67.) The 2016 Plaintiffs allege that Capital Health continues to misrepresent that the Transfer Hotline belongs to Capital Health while, pursuant to his employment agreement, the Transfer Hotline belongs to Dr. Veznedaroglu. (*Id.* ¶¶ 70-71.) Further, the 2016 Plaintiffs allege that Capital Health uses the Transfer Hotline to confuse physicians and that Capital Health benefits from Dr. Veznedaroglu's patient referrals. (*Id.* ¶ 76.) The 2016 Plaintiffs also allege that Capital Health's stickers contain words and symbols that falsely represent that the Transfer Hotline belongs to Capital Health. (*Id.*)

On November 24, 2015, Capital Health initiated the 2015 Action against the 2016 Plaintiffs. (*Id.* ¶ 95.) The 2016 Plaintiffs allege that Capital Health's "Complaint, Amended

Complaint, and additional filings in this action are replete with libelous statements about" Dr. Veznedaroglu and are meant to destroy Dr. Veznedaroglu's professional reputation. (*Id.* ¶¶ 97, 102.) In addition, the 2016 Plaintiffs argue that the 2016 Defendants provided a copy of their Complaint to a variety of news sources, two of which printed in-depth articles about the matter, depicting a "false portrait" of Dr. Veznedaroglu and his practice. (*Id.* ¶ 104.)

Since this litigation commenced, the 2016 Plaintiffs claim that Capital Health continues to take adverse actions against GNI Physicians. (*See id.* ¶¶ 109-22.) For instance, on December 18, 2015, Capital Health sent correspondence to GNI, providing thirty days' notice of termination of the Space and Support Agreement. (*Id.* ¶ 110.) Additionally, the 2016 Plaintiffs claim that "when patients or referring physicians inquired as to how to reach the GNI Physicians," Capital Health employees answered "I don't know" or "they don't work here" while the GNI Physicians "maintained office space on [Capital Health's] premises and/or contact information was listed on [Capital Health's] website." (*Id.* ¶ 118.)

Presently, the 2016 Plaintiffs claim that Capital Health has refused to let Dr. Veznedaroglu or GNI have access to the Transfer Hotline. (*Id.* ¶ 122.) Instead, Capital Health has, through its fraudulent and unethical misrepresentations, procured referrals from physicians seeking one of the GNI Physicians and fraudulently retained the referrals for Capital Health, causing immediate and direct harm to GNI. (*Id.*)

## II.   **Legal Standard**

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). On a motion to dismiss for failure to state a claim, a

"defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

When considering a Rule 12(b)(6) motion, the Court conducts a three-part analysis. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the [C]ourt must 'take note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the Court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The Court, however, may disregard any conclusory allegations proffered in the complaint. *Id.* For example, the Court is free to ignore legal conclusions or factually unsupported accusations, which merely state that "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, once the well-pleaded facts have been identified and the conclusory allegations ignored, the Court must next determine whether the "facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

Determining plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Plausibility, however, "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). In the end, facts which only suggest the "mere possibility of misconduct" fail to show that the plaintiff is entitled to relief. *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

III.   **Parties' Positions**[3]

A.   **The 2015 Action**

With regard to the 2015 Action, the GNI Defendants first argue improper group pleading as a general matter, and that in particular Dr. Rao and Dr. Eckhardt (collectively, "GNI Fellows") are hardly mentioned in the Second Amended Complaint, thus warranting their dismissal as to certain counts. (GNI's Moving Br. 9, ECF No. 107.) As for the count-by-count arguments, the 2015 Defendants collectively argue that Capital Health fails to sufficiently plead a false advertising claim under the Lanham Act, and that Capital Health did not properly plead a separate false designation of origin claim. (*Id.* at 10; Drexel's Moving Br. 7, ECF No. 104.)

Next, the GNI Defendants argue that Capital Health's breach of contract claim based on the on-call agreements fails to state a claim because it seeks to enforce duties not enumerated in the contract and because Capital Health's interpretation of the terms would give rise to an unenforceable contract. (GNI's Moving Br. 28.) The GNI Defendants further assert that Capital Health's claims for breach of the covenant of good faith and fair dealing should be dismissed based on the terms of the contract and because the allegations are conclusory. (*Id.* at 33.) Next, the GNI Defendants argue that Capital Health's disloyalty claims should be dismissed for being duplicative of the breach-of-contract claims. (*Id.* at 25.)

The 2015 Defendants also collectively argue that Capital Health's unfair competition claim is inadequately pled because it relies on the same elements as other causes of action, thereby constituting a duplicative claim that fails for the same reasons as argued on the other causes of

---

[3] In light of the voluminous arguments presented by each party in support of or in opposition to the pending motions, the Court provides only a brief summary of the parties' positions. Notwithstanding the brevity of the Court's recitation of the parties' positions, the Court carefully reviewed the full extent of the parties' arguments.

action. (*Id.* at 24; Drexel's Moving Br. 32.)  Additionally, the 2015 Defendants argue that the Court should dismiss the various counts for tortious interference with prospective and existing contracts in light of the fact that Capital Health failed to sufficiently plead each of the requisite elements. (GNI's Moving Br. 34-37; Drexel's Moving Br. 17.)  Lastly, the 2015 Defendants seek dismissal of Capital Health's conversion claim because it involves intangible property, Capital Health's civil conspiracy claim for failure to plead an agreement, and Capital Health's unjust enrichment claim for being duplicative of other claims already pled and for failing to plead a sufficient direct relationship between the parties.  (GNI's Moving Br. 25; Drexel's Moving Br. 14.)

In opposition to the Lanham Act issue, Capital Health argues that false advertising claims do not require literal falsehoods and that the allegations as pled should survive a motion to dismiss due to the factual disputes at issue.  (Capital Health's Opp'n to GNI 14, ECF No. 111; Capital Health's Opp'n to Drexel 9, ECF No. 112.)  Capital Health further argues that despite lacking a separate section for a false designation of origin claim, that the Second Amended Complaint pleads the necessary elements. (Capital Health's Opp'n to GNI 20-23; Capital Health's Opp'n to Drexel 13.)  As to the breach of contract claim, Capital Health asserts that the GNI Defendants' interpretation of the contract gives rise to ambiguity that should be resolved at summary judgment or trial. (Capital Health's Opp'n to GNI 28.)  As to the claims for breach of the covenant of good faith and fair dealing, Capital Health asserts that various sections of the Second Amended Complaint fulfill the requisite elements, despite the fact that those facts are pled outside of the section dedicated to this cause of action. (*Id.* at 29.)  Additionally, Capital Health interprets the GNI Defendants' Motion to Dismiss as not challenging Capital Health's claim of disloyalty. (*Id.* at 29 n.7.)

With regard to the unfair competition claim, Capital Health asserts that the claim encompasses allegations beyond the facts giving rise to other counts, such as the Lanham Act claim. (Capital Health's Opp'n to GNI 24-25; Capital Health's Opp'n to Drexel 34.) Next, Capital Health argues that the 2015 Defendants misinterpret the legal requirements for adequately pleading claims of tortious interference. (Capital Health's Opp'n to GNI 30; Capital Health's Opp'n to Drexel 18, 26.) Similarly, Capital Health argues that the 2015 Defendants' attempt to exclude intangible property from a valid conversion claim is based on outdated common law interpretations. (Capital Health's Opp'n to GNI 25; Capital Health's Opp'n to Drexel 14.) With regard to civil conspiracy, Capital Health asserts that circumstantial allegations are sufficient at the pleading stage. (Capital Health's Opp'n to GNI 38-39; Capital Health's Opp'n to Drexel 38-39.) Finally, with regard to unjust enrichment, Capital Health argues that there was a sufficient relationship between the parties. (Capital Health's Opp'n to GNI 38; Capital Health's Opp'n to Drexel 37-38.)

**B.    The 2016 Action**

With regard to the 2016 Plaintiffs' Federal and New Jersey RICO claims, Dr. Maghazeh argues that the Complaint fails to plead sufficient details pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, and that the proper elements of the underlying predicate acts were also insufficiently pled. (Dr. Maghazeh's Moving Br. 33, ECF No. 105.) Next, the Capital Health Defendants argue that the 2016 Plaintiffs' claims for tortious interference, false light, and libel are all based on the filing of court documents in the 2015 Action, and the dissemination of those documents to the press. (Capital Health's Moving Br. 16, ECF No. 106.) According to the Capital Health Defendants, litigation privilege and the *Noerr-Pennington* Doctrine preclude these claims. (*Id.*) As to the Lanham Act, unfair competition, and conversion claims, the Capital Health

12

Defendants argue that the fact that Capital Health owns the Transfer Hotline requires dismissal of these counts. (*Id.* at 4-8.)

In opposition to the motion on the Federal and New Jersey RICO claims, the 2016 Plaintiffs contend that Dr. Maghazehe refers only to the Complaint and not the RICO case statement that contains the allegations necessary to survive a motion to dismiss. (2016 Pls.' Opp'n to Dr. Maghazehe 10-11, ECF No. 113.) With regard to the litigation privilege and *Noerr-Pennington* Doctrine arguments, the 2016 Plaintiffs assert that those immunities do not extend to the dissemination of court filings to the press. (2016 Pls.' Opp'n to Capital Health 27-30, ECF No. 114.) Lastly, with regard to the Lanham Act, unfair competition, and conversion claims, the 2016 Plaintiffs argue that there has not yet been a determination that Capital Health owns the Transfer Hotline. (*Id.* at 20-22.)

## IV.   Analysis

### A.   The 2015 Action

#### 1.   The GNI Fellows

The Court first considers the GNI Defendants' general objection to group pleading especially with regard to the sparse mention of the GNI Fellows throughout the Second Amended Complaint. (GNI's Moving Br. 9-10.) Upon reviewing the Second Amended Complaint, the Court disagrees with the GNI Defendants' general objection and finds that the Second Amended Complaint sufficiently identifies the GNI Fellows with the particular events giving rise to the various causes of action. Accordingly, with regard to the GNI Fellows, as to Counts One, Seven, Eight, Nine, Twelve, and Thirteen, the Court **DENIES** the 2015 Defendants' Motions to Dismiss.

#### 2.   Count I: Lanham Act

Section 43(a) of the Lanham Act governs claims of false designation of origin and false advertisement:

1)   Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  To make a claim for false advertising, a plaintiff must plead the following elements:

1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharm. Corp.*, 197 F. App'x 120, 122 (3d Cir. 2006) (quoting *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 872 (3d Cir. 1992)). A claim for false advertising is subject to a slightly heightened pleading standard such that a plaintiff must plead "sufficiently detailed allegations regarding the nature of the alleged falsehoods to allow him to make a proper defense." *Trans USA Prods., Inc. v. Howard Berger Co.*, No. 07-5924, 2008 WL 852324, at *5 (D.N.J. Mar. 28, 2008).

As to the first element—false or misleading statements—a plaintiff must plead that the defendant's message or statement was "either (1) literally false or (2) literally true or ambiguous, but

has the tendency to deceive consumers." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (citation omitted).  Capital Health's false advertising claim against Drexel is based on two purported representations by Drexel: 1) the alleged misrepresentation on Drexel's website that Drexel Neurosciences Institute operates at Capital Health; and 2) the alleged misrepresentation on Drexel's website that Peter Gliebus, M.D. and Michelle Dougherty, M.D. were associated with Capital Health. (2015 2d Am. Compl. ¶¶ 95, 97, 191.)  With regard to the first allegation, Capital Health does not allege a literal falsehood, but instead claims that the website was misleading and deceptive.  (Capital Health's Opp'n to Drexel 9-10, ECF No. 112.) Here, the Court finds that Capital Health has sufficiently pled the first element, stating that "patients and physicians have been confused and misled into believing that the Drexel Neurosciences Institute has a location at Capital [Health]." (2015 2d Am. Compl. ¶ 98.)  Similarly, the Court agrees with Capital Health with regard to the second allegation.  Capital Health has pled that the two doctors in question were no longer associated with Capital Health at the time the alleged misrepresentations were published on Drexel's website.  (*Id.* ¶ 97.)  As this is the motion-to-dismiss stage of the litigation, the Court declines to consider the extrinsic evidence proffered by Drexel.

With regard to Capital Health's false advertising claim against the remaining 2015 Defendants, the Court considers similar arguments that certain e-mail messages sent by some of the 2015 Defendants and the Transfer Hotline stickers were not literally false statements.  Similar to its finding with respect to Drexel's arguments above, the Court finds that Capital Health has sufficiently pled the existence of misleading statements.  (*Id.* ¶¶ 145-49.)

Next, Drexel argues that Capital Health failed to plead the requisite causal connection between the alleged misrepresentation that the Drexel Neurosciences Institute has a Capital Health location and the harm Capital Health claims.  (Drexel's Moving Br. 12-13 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 (2014).)  In support, Drexel contends that the disclaimer on the website was explicit, thus precluding the possibility of any harm.  (*Id.* at 13.)  In light

of the Court's determination that Capital Health adequately pled the misleading or deceptive nature of the website, the Court finds Drexel's argument unpersuasive at this stage of the litigation. The remaining 2015 Defendants also make a similar argument to Drexel, asserting that the alleged false or misleading statements were not material to any purchasing decisions. (GNI's Moving Br. 16.) The Court disagrees. The GNI Defendants cite *Allen Organ Co. v. Galanti Oran Builders, Inc.*, 798 F. Supp. 1162, 1169 (E.D. Pa. 1992), for the proposition that advertising is typically immaterial for sophisticated purchasing decisions, such as neurosurgical care. (GNI's Moving Br. 16-17.) In *Allen Organ*, however, the Eastern District of Pennsylvania resolved this issue at trial. Here, the Court finds that Capital Health has sufficiently pled its claim at the motion-to-dismiss stage.

Next, the 2015 Defendants argue that Capital Health's claims fail to satisfy the interstate commerce requirement of the Lanham Act. (Drexel's Moving Br. 7 n.6; GNI's Moving Br. 18-19.) Defendants argue that Capital Health fails to allege relevant interstate activity other than a conclusory statement that "Defendants disseminated these words and symbols to interstate customers and/or potential customers." (GNI's Moving Br. 19 (quoting 2015 2d Am. Compl. ¶ 193).) The GNI Defendants, however, are incorrect. There are numerous allegations in the Second Amended Complaint where Capital Health specifically alleges the diversion of patients across state lines as a result of the 2015 Defendants' purported false advertising. (*See, e.g.*, 2015 2d Am. Compl. ¶¶ 11, 123, 131.)

Next, the 2015 Defendants in both motions argue that it is unclear from the Second Amended Complaint whether Capital Health intended to bring a separate cause of action for false designation of origin, in addition to the false advertisement allegation. (Drexel's Moving Br. 7 n.6; GNI's Moving Br. 10.) The Court disagrees with the 2015 Defendants and finds that Capital Health has pled a separate cause of action for false designation of origin. As Capital Health outlines in its opposition, the Second Amended Complaint sufficiently pleads the claim at the motion-to-dismiss stage along with the relevant statutory provision notwithstanding the fact that Capital Health did not include a separate

16

entitled section in the Second Amended Complaint.   The Court, therefore, **DENIES** the 2015 Defendants' Motions to Dismiss with regard to Count One.

3.    Count III: Breach of the On-Call Agreements (Defendants Veznedaroglu, Liebman, Hakma, and Binning)

With regard to Count Three, the GNI Defendants argue that the claim should be dismissed because the contract does not explicitly enumerate the duties that Capital Health alleges that the 2015 Defendants breached, and because the contract would otherwise violate the Anti-Kickback Statute. (GNI's Moving Br. 27-30.) Upon reviewing the parties' submissions, the Court disagrees. The Court finds sufficient ambiguity in the language of the on-call agreement for the claim to survive a motion to dismiss. Accordingly, the GNI Defendants' Motion to Dismiss as to Count III is **DENIED**.

4.    Counts IV, V & XVI: Breach of Implied Covenant of Good Faith & Fair Dealing

The GNI Defendants assert that Capital Health has failed to sufficiently plead claims for breach of the implied covenants of good faith and fair dealing because the allegations are conclusory, and permitting the claim to survive would contradict the various agreements' integration clauses. (GNI's Moving Br. 32-33.) The Court disagrees. Throughout the Second Amended Complaint, Capital Health has consistently pled the specific factual bases for its claims. Moreover, "[a]lthough the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term." *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J. 2001). The integration clauses, therefore, do not preclude the Court from permitting the claim to survive a motion to dismiss. The Court, accordingly, **DENIES** the GNI Defendants' Motion to Dismiss as to Counts Four, Five, and Sixteen.

5.    Count VI: Disloyalty (Defendant Veznedaroglu)

In a footnote, the GNI Defendants argue that the Court should dismiss Capital Health's claim of disloyalty against Dr. Veznedaroglu. (GNI's Moving Br. 25 n.12.) The GNI Defendants contend

that the claim is duplicative of Capital Health's breach of employment agreement claim, and therefore should be dismissed. (*Id.*) Capital Health, however, did not notice the argument in the footnote, and therefore did not respond. (*See* Capital Health's Opp'n to GNI 29 n.7.)  Upon reviewing the GNI Defendants' cursory discussion of this issue, the Court disagrees given the facts of this case.  Because the scope of the contracts at issue is undetermined at this stage of the litigation, the Court is unable to conclude that the disloyalty claim would be duplicative as a matter of law.  Accordingly, the GNI Defendants' Motion to Dismiss is **DENIED** as to Count Six.

### 6.    Count VII: Unfair Competition

Both Motions to Dismiss request dismissal of Count Seven for the same reasons the 2015 Defendants move to dismiss Capital Health's claims under the Lanham Act and for tortious interference. (Drexel's Moving Br. 32-34; GNI's Moving Br. 23-25.)  The GNI Defendants further argue that because of the duplicative nature of Count Seven, the Court should dismiss the unfair competition claim. (GNI's Moving Br. 23-25.)  "New Jersey's 'law of unfair competition is an amorphous area of jurisprudence. It knows of no clear boundaries . . . . The concept is as flexible and elastic as the evolving standards of commercial morality demand.'" *Duffy v. Charles Schwab & Co.*, 123 F. Supp. 2d 802, 815-16 (D.N.J. 2000) (quoting *N.J. Optometric Ass'n v. Hillman–Kohan Eyeglasses, Inc.*, 365 A.2d 956, 965 (N.J. Super. Ct. Ch. Div. 1976)).  "[T]he essence of unfair competition is [the violation of] fair play," typically involving unfair or deceptive practices. *Columbia Broadcasting Sys., Inc. v. Melody Recordings, Inc.*, 341 A.2d 348, 376 (N.J. Super. Ct. App. Div. 1975).  "Although it is impossible to categorize all acts which constitute unfair competition," it generally "consists of the misappropriation of one's property by another—or property which has some sort of commercial or pecuniary value." *Duffy*, 123 F. Supp. 2d at 815-16.

Here, as discussed, the Court denies both Motions to Dismiss as they relate to the Lanham Act and tortious interference allegations, and similarly does not find the arguments supporting those

motions compelling for the purposes of evaluating the dismissal of Count Seven.  With regard to the 2015 Defendants' arguments that Capital Health's unfair competition claim is duplicative of other counts, the Court acknowledges the overlap but disagrees that it warrants dismissal given the unique facts pled in this case.  Rather, the Court agrees with Capital Health that the unfair competition claim encompasses more than just the Lanham Act and tortious interference claims.  The Court, therefore, **DENIES** the 2015 Defendants' Motions to Dismiss with regard to Count Seven.

       7.    <u>Count VIII: Tortious Interference with Prospective Economic Advantage and Contract</u>

A claim for tortious interference with prospective business advantage exists where there is a "luring away, by devious, improper and unrighteous means, of the customer of another."  *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 382 (3d Cir. 2016).   To properly plead a claim, a plaintiff must plead: 1) "that it had a reasonable expectation of economic advantage"; 2) "which was lost as a direct result of [the defendant's] malicious interference"; and 3) "that it suffered losses thereby."  *Id.* (quoting *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 659 A.2d 904, 932 (N.J. Super. Ct. App. Div. 1995)).  The 2015 Defendants move to dismiss Count Eight for failure to satisfy the first and second elements.

Here, Capital Health's claim arises from the allegation that the 2015 Defendants used the Transfer Hotline to divert prospective Capital Health patients to hospitals outside of New Jersey for treatment by Drexel's Neurosciences Institute.  (2015 2d Am. Compl. ¶ 123; Capital Health's Opp'n to Drexel 30-31.)  Drexel argues that Capital Health's allegations of malice were conclusory, and that Capital Health failed to identify the prospective patients it lost, which is necessary to demonstrate a "reasonable expectation of economic advantage."  (Drexel's Moving Br. 10-14.)  Although Capital Health does not identify specific customers, the Court finds that Capital Health sufficiently pled the first and second elements by alleging that the 2015 Defendants intentionally diverted patients by misappropriating Capital Health's Transfer Hotline.  (2015 2d Am. Compl. ¶¶ 121-25.)

This District has consistently found that a reasonable expectation of economic benefit can exist "even where the sale is to the public at large" as long as the plaintiff was in the active "pursuit of business." *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics*, No. 10-453, 2010 WL 5239238, at *3 (D.N.J. Dec. 16, 2010) (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989)). Here, Capital Health maintains the Transfer Hotline as a direct method for transferring patients to Capital Health physicians, thereby directly pursuing the prospective business being transferred via the Transfer Hotline. Capital Health, therefore, has adequately alleged a reasonable expectation for receiving the prospective business in connection with the Transfer Hotline.

Capital Health has also adequately pled the second element, which only requires "the intentional doing of a wrongful act without justification or excuse." *Avaya Inc., RP*, 838 F.3d at 383 (quoting *Printing Mart*, 563 A.2d at 39). In other words, a plaintiff must plead that the alleged conduct "would not be sanctioned by 'the rules of the game'" according to the customs of the relevant industry. *Printing Mart*, 563 A.2d at 40. Accordingly, Capital Health has adequately pled that the 2015 Defendants misappropriated the Transfer Hotline to interfere with Capital Health's prospective business. The 2015 Defendants' Motions to Dismiss as to Count Eight is therefore **DENIED**.

### 8.   Count IX: Conversion

Both Motions to Dismiss the 2015 Action argue that Capital Health's conversion claim fails because conversion cannot occur over intangible property, such as the Transfer Hotline. (Drexel's Moving Br. 14-16; GNI's Moving Br. 26-27.) Although Capital Health cites numerous cases from outside the Third Circuit and New Jersey demonstrating valid conversion claims for telephone numbers, the Court finds the 2015 Defendants' reliance on New Jersey law to be persuasive.

In New Jersey, conversion is defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Ricketti v. Barry*, No. 13-6804, 2015 WL 1013547, at *8 (D.N.J. Mar. 9, 2015) (quoting *LaPlace v. Briere*, 962 A.2d 1139, 1144 (N.J. Super. Ct. App. Div. 2009)).

"The elements of common law conversion under New Jersey law are (1) the existence of property, (2) the right to immediate possession thereof belonging to [the] plaintiff, and (3) the wrongful interference with that right by [the] defendant." *Adami v. Cardo Windows, Inc.*, No 12-2804, 2014 WL 2586933, at *15 (D.N.J. June 10, 2014). Absent a specific holding from the New Jersey Supreme Court regarding the conversion of intangible property, this District has consistently interpreted New Jersey law to limit conversion to tangible property. *See Ricketti*, 2015 WL 1013547, at *8 (compiling numerous cases from the District of New Jersey finding that intangible property cannot be subject to conversion). As the parties do not dispute that a telephone number is intangible property, the Court **GRANTS** both Motions to Dismiss as to Count Nine without prejudice.

### 9.   Count XII: Civil Conspiracy

Both Motions to Dismiss the 2015 Action argue that Capital Health's civil conspiracy claim should be dismissed for failure to plead that there was an agreement between the 2015 Defendants to engage in the purported unlawful conduct. (Drexel's Moving Br. 36-39; GNI's Moving Br. 39-40.)

Under New Jersey law, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Zodda v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 13-7738, 2014 WL 1577694, at *5 (D.N.J. Apr. 21, 2014) (quoting *Banco Popular N. Am. v. Gandi*, 876 A.2d 253 (N.J. 2005)). Additionally, a plaintiff must plead an underlying tort to survive a motion to dismiss. *Id.*

Here, the Court finds that Capital Health has adequately pled a claim for civil conspiracy. Under New Jersey law, it is "'well known that the nature of a conspiracy is such that more often than not the only type of evidence available' is circumstantial in nature." *Morgan v. Union Cty. Bd. of Chosen Freeholders*, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993) (quoting *Bd. of Educ. v. Hoek*, 183 A.2d 633, 646-47 (N.J. 1962)). As a result, "the question whether an agreement exists

should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can 'infer from the circumstances [that the alleged conspirators] had a meeting of the minds and thus reached an understanding' to achieve the conspiracy's objectives." *Id.* (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979) (alteration in original)).  Moreover, a valid claim for civil conspiracy need not establish that each alleged participant knew the "exact limits" of the conspiracy, but rather a "general conspiratorial objective" is sufficient. *Id.* at 998-99.  Here, Capital Health has pled numerous specific torts and circumstantial allegations surrounding the purported agreement throughout the Second Amended Complaint.  Accordingly, the Court **DENIES** the 2015 Defendants' Motions to Dismiss as to Count Twelve.

### 10.   Count XIII: Unjust Enrichment

Both Motions to Dismiss the 2015 Action argue that Capital Health's unjust enrichment claim should be dismissed for being duplicative of Capital Health's breach of contract claims[4] and failing to allege a sufficient direct relationship between Capital Health and the 2015 Defendants.  (Drexel's Moving Br. 35-36; GNI's Moving Br. 38-39; Drexel's Reply Br. 14-15.)

To adequately plead a claim for unjust enrichment, a plaintiff must allege: "(1) that the defendant has received a benefit from the plaintiff, and (2) that the retention of the benefit by [the] defendant is inequitable." *Bedi v. BMW of N. Am., LLC*, No. 15-1898, 2016 WL 324950, at *5 (D.N.J. Jan. 27, 2016) (quoting *Wanaque Borough Sewage Auth. v. Twp. of W. Milford*, 677 A.2d 747, 753 (N.J. 1996)).  Because unjust enrichment arises in contract law, as opposed to tort law, "there must be a direct relationship between the parties," "or a mistake on the part of the person conferring the

---

[4] The 2015 Defendants only make this argument in passing and in response to Capital Health's argument that a sufficient relationship existed due to the related contracts. The Court finds the 2015 Defendants' argument unpersuasive given that the breach of contract claims arise from different facts and allege harms different from those arising from the unjust enrichment claim. (*See* 2015 2d Am. Compl. ¶¶ 170-71, 173, 177-78) (alleging that various defendants breached various noncompete and nonsolicitation provisions in their employment agreements with Capital Health).)

benefit." *Id.* (citing *Spera v. Samsung Elecs. Am., Inc.*, No 12-5412, 2014 WL 1334256, at *8-9 (D.N.J. Apr. 2, 2014)); *Stewart v. Beam Glob. Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 196 (D.N.J. 2012). This District has interpreted New Jersey's "direct relationship" requirement as unnecessary where it can be demonstrated that the defendant is not merely an innocent third party. *Stewart*, 877 F. Supp. 2d at 196-201. Here, just as in *Stewart*, the 2015 Defendants were all allegedly involved in perpetuating the purported fraud in connection with the Transfer Hotline. The Court, therefore, **DENIES** the 2015 Defendants' Motions to Dismiss as to Count Thirteen.

11.    <u>Counts X, XIV & XVII: Tortious Interference with Existing Contracts</u>

To properly plead a tortious interference claim, a plaintiff must allege: (1) "that it had a reasonable expectation of economic advantage"; (2) "which was lost as a direct result of [the defendants'] malicious interference"; and (3) "that it suffered losses thereby." *Avaya Inc., RP*, 838 F.3d at 382 (quoting *Ideal Dairy Farms, Inc.*, 659 A.2d at 932). Here, the GNI Defendants argue that the Second Amended Complaint fails to allege sufficient facts to satisfy the three elements. (GNI's Moving Br. 35.) The Court disagrees. As Capital Health outlines in its opposition, the Second Amended Complaint pleads sufficient facts in support of each element. (Capital Health's Opp'n to GNI 33-36.) Accordingly, the Court **DENIES** the GNI Defendants' Motion to Dismiss with regard to Counts Ten, Fourteen, and Seventeen.

**B.   The 2016 Action**

1.    <u>Counts I & II: Federal and New Jersey RICO (Dr. Maghazehe and John Does 1-4)</u>

With regard to the 2016 Plaintiffs' RICO claim, a proper claim must plead: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010). "Moreover, where the plaintiff presents a fraud-based RICO claim, he must plead with particularity the circumstances of the alleged fraud." *Mierzwa v. Safe & Secure Self Storage, LLC*, 493 F. App'x 273, 276 (3d Cir. 2012). To survive a

23

motion to dismiss, a plaintiff must "allege facts to show that each [d]efendant objectively manifested an agreement to participate, directly or indirectly, in the affairs of a RICO enterprise through the commission of two or more predicate acts." *The Knit With v. Knitting Fever, Inc.*, 625 F. App'x 27, 36 (3d Cir. 2015).

Similarly, under New Jersey law, "[e]xcept where inconsistent with [New Jersey Supreme Court and Appellate Division decisions], New Jersey will . . . look to federal decisions interpreting RICO." *Patel v. Pandya*, No. 14-08127, 2015 WL 4523283, at *4 (D.N.J. July 27, 2015). "Analogous to the United States Supreme Court which has stated that a [RICO violation] requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, the same basic elements apply to a cause of action under the [New Jersey RICO statute]." *Id.*

"Specificity is imperative in this matter, both because [a] [p]laintiff['s] fraud allegations implicate the heightened pleading standard of Rule 9(b) and because the RICO statute itself requires specificity, particularly in light of the heavy penalties imposed upon an unsuccessful RICO defendant." *Grant v. Turner*, No. 09-2381, 2010 WL 4004719, at *4 (D.N.J. Oct. 12, 2010). "Thus, conclusory allegations are not sufficient to withstand Rule 9(b). . . . This requires a plaintiff to plead the date, time, and place of the alleged fraud, or otherwise inject precision into the allegations by some alternative means." *Grant v. Turner*, 505 F. App'x 107, 111 (3d Cir. 2012). Here, the 2016 Plaintiffs allege mail fraud and wire fraud as the predicate acts. (2016 Compl. ¶¶ 127-28.)

The elements of mail or wire fraud are: "(a) a scheme to defraud, and (2) a mailing or wire in furtherance of that scheme." *Annulli v. Panikkar*, 200 F.3d 189, 200 n.9 (3d Cir. 1999). "The scheme to defraud . . . does not have to 'be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary

prudence and comprehension.'" *In re Ins. Brokerage Antitrust Litig.*, 2016 WL 5219456, at *8 (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004)). Additionally, the Court can "only consider as predicate racketeering acts those wire frauds which have been alleged to have been transmitted by wire 'in interstate or foreign commerce' and those mail frauds that are alleged to have made use of the United States Postal Service." *Briksza v. Moloney*, No. 08-1785, 2009 WL 1767594, at *9 (D.N.J. June 19, 2009).

Upon reviewing the parties' submissions, the Court finds that the 2016 Plaintiffs' RICO claims are not ripe for determination at the motion-to-dismiss stage given the numerous factual issues raised by the parties. The Court agrees with the 2016 Plaintiffs that they have adequately pled the elements of federal and New Jersey RICO actions in the complaint and the RICO statement to survive a motion to dismiss pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. Accordingly, the Court **DENIES** Dr. Maghazehe's Motion to Dismiss Counts One and Two.

2.  <u>Count VIII, X & XI: Tortious Interference (Capital Health), False Light (Capital Health) and Libel (Capital Health)</u>

The Capital Health Defendants seek to dismiss Counts Eight, Ten, and Eleven pursuant to the Litigation Privilege and *Noerr-Pennington* Doctrines. All three of these counts arise from the 2016 Plaintiffs' allegations that Capital Health included false or deceptive information in its 2015 Complaint, and other court filings in the 2015 Action. (*See* 2016 Compl. ¶¶ 185-92, 201-09.) The allegations merely claim that Capital Health provided the 2015 Complaint and court filings to the press, thereby leading to the purported injuries to the 2016 Plaintiffs. (*Id.*)

First, the Court agrees with the 2016 Plaintiffs that the litigation privilege does not extend to "distribution of court-filed documents to the press." *Williams v. Kenney*, 877 A.2d 277, 287 (N.J. Super. Ct. App. Div. 2005). With regard to Capital Health's arguments that the *Noerr-Pennington*

Case 3:15-cv-08288-MAS-LHG  Document 123  Filed 02/27/17  Page 26 of 27 PageID: 3195

Doctrine precludes these claims, however, the Court agrees with Capital Health. Courts have generally applied the *Noerr-Pennington* Doctrine to preclude defamation claims, and the Doctrine has been extended to press releases unless the original petitioning conduct was baseless. *See, e.g.*, *Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*, 384 F. Supp. 2d 1334, 1349-50 (S.D. Iowa 2005) (extending immunity to press releases); *Aircapital Cablevision, Inc. v. Starlink Commc'ns Grp.*, 634 F. Supp. 316, 325-26 (D. Kan. 1986) (extending immunity to press releases); *ABC Int'l Traders v. Yama Corp. of Am.*, No. 86-7892, 1993 U.S. Dist. LEXIS 20947, at *14-15 (C.D. Cal. Jan. 27, 1993) (applying immunity where a litigant "publicized the fact and content of its lawsuits" against the defendant). In their opposition, the 2016 Plaintiffs fail to cite any contrary case law specifically with regard to the *Noerr-Pennington* Doctrine. The Court is similarly unaware of any authority indicating that press releases based on non-sham court-filings remain outside the scope of immunity. Accordingly, the Court **GRANTS** the Capital Health Defendants' Motion to Dismiss as to Counts Eight, Ten, and Eleven without prejudice.

3.    Counts III, IV & VII: Lanham Act (Capital Health), Unfair Competition (Capital Health), and Conversion (Capital Health)

With regard to Counts Three, Four, and Seven of the 2016 Complaint, the Capital Health Defendants contend that the fact that Capital Health owns the Transfer Hotline precludes these three counts from surviving a motion to dismiss as a matter of law. (Capital Health's Moving Br. 4-8.) The Court, however, has not made a determination that Capital Health owns the Transfer Hotline, and is unable to make that determination at the motion-to-dismiss stage based on the parties' submissions. Accordingly, the Court **DENIES** the Capital Health Defendants' Motion to Dismiss as to Counts Three and Four. With regard to the conversion claim, however, for the reasons stated above with regard to the 2015 Action's conversion claim, the Court **GRANTS** the Capital Health Defendants' Motion to dismiss as to Count Seven.

26

## V.      Conclusion

For the reasons set forth above, the 2015 Defendants' Motions to Dismiss are **GRANTED** in part and **DENIED** in part and the 2016 Defendants' Motions to Dismiss are **GRANTED** in part and **DENIED** in part.  An order consistent with this Memorandum Opinion will be entered.

s/Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

**Dated:** February 27, 2017