UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CAPITAL HEALTH SYSTEM, INC., <br><br> Plaintiff, <br><br> v. <br><br> EROL VEZNEDAROGLU, DREXEL UNIVERSITY, GLOBAL NEUROSCIENCES INSTITUTE, KENNETH LIEBMAN, ZAKARIA HAKMA, MANDY BINNING, GERALD ECKHARDT; and VIKAS RAO <br><br> Defendants. | CIVIL ACTION <br> NO. 3:15-cv-08288-MAS-LHG |

**PLAINTIFF CAPITAL HEALTH SYSTEM, INC.'S, MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO AMEND THE COMPLAINT**

**EPSTEIN BECKER & GREEN, P.C.**
150 College Road West, Suite 301
Princeton, New Jersey 08540
(609) 455-1540 (phone)
(609) 228-5318 (fax)

Attorneys for Plaintiff
Capital Health System, Inc.

Of Counsel and on the Brief:
Anthony Argiropoulos, Esquire
Thomas Kane, Esquire
Scheherazade Wasty, Esquire

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..............................................1

    I.    DEFENDANTS HAVE NO MEANINGFUL RESPONSE TO THE EVIDENCE THAT DR. VEZNEDAROGLU, ACTING IN HIS CAPACITY AS DIRECTOR OF DNI, PLOTTED TO CAUSE CAPITAL FINANCIAL HARM BY ███████████████████████████ ███████ SO THAT HE COULD TAKEOVER CAPITAL'S HOPEWELL CAMPUS AND BUILD A ██████████████████████████ ██████████.................................................2

    II.    THERE IS GOOD CAUSE UNDER <u>RULE</u> 16 BECAUSE DEFENDANTS CONCEALED THE ██████████████████████ SCHEME UNTIL AFTER THE DEADLINE TO AMEND THE COMPLAINT, AND THE COURT ALREADY RULED THAT THERE IS GOOD CAUSE WHEN IT AMENDED THE SCHEDULING ORDER TO ALLOW DISCOVERY ON THIS ISSUE..................................................4

        A.    Defendants Wrongfully Concealed the ██████████ ██████████ Scheme in Discovery.................5

        B.    The Court Found that There was Good Cause to Amend the Scheduling Order When it Permitted Capital to Take Additional Discovery on These Issues............................................9

    III.    DEFENDANTS CANNOT DEMONSTRATE ANY PREJUDICE UNDER <u>RULE</u> 15........................................12

CONCLUSION.....................................................15

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Adams v. Gould Inc.,
   739 F.2d 858, 868 (3d Cir. 1984) ..............................12

High 5 Games, LLC v. Marks,
   No. 13-7161 (JMV), 2017 U.S. Dist. LEXIS 9302
   (D.N.J. Jan. 24, 2017) (Falk, J.) ...................11, 12, 13

Korrow v. Aaron's, Inc.,
   300 F.R.D. 215 (D.N.J. 2014) .................................12

**Other Authorities**

Fed. R. Civ. P. 15(b)(1).........................................12

Fed. R. Civ. P. 15(b)(2)....................................12, 15

Fed. R. Civ. P. 8................................................14

Fed. R. Civ. P. 9(b).............................................14

Fed. R. Civ. P. 15.........................................1, 12, 13

Fed. R. Civ. P. 16.........................................*passim*

Fed. R. Civ. P. 30(b)(6).............................3, 7, 8, 10

**PRELIMINARY STATEMENT**

Defendants' oppositions to Capital's motion for leave to amend are a hodge-podge of inaccurate factual and legal claims wrapped in over-heated rhetoric. It is Defendants, after all, who very clearly violated this Court's discovery rules and standards by hiding the ▮▮▮▮▮▮▮▮▮▮ scheme from Capital in discovery. Instead of explaining their actions, however, or showing any contrition, they try to throw mud at Capital. According to Drexel, Capital attorneys have shown "bad faith" and made "misrepresentations" to the Court. See Drexel Br. at 19. GNI, in turn, accuses Capital of "stretch[ing]—if not outright break[ing]—its duty of candor to the Court." See GNI Br. at 2.

Because of the limited space available for a reply, Capital cannot respond to every misstatement of fact and law Defendants have made.[1] The following, however, clearly demonstrates that Capital's proposed amendment is proper under Rules 15 and 16 and in the interests of justice. Accordingly, Capital's motion for leave to amend should be granted.

---

[1] Notably, because Defendants each responded with separate, full-length opposition briefs, Capital asked Defendants to agree to additional space so that it could fully respond to all of their inaccuracies. Defendants refused—unless Capital agreed to give each of them sur-reply briefs of indeterminate length. Defendants obviously know that their arguments do not hold-up if Capital is given a fair opportunity to respond.

**I. DEFENDANTS HAVE NO MEANINGFUL RESPONSE TO THE EVIDENCE THAT DR. VEZNEDAROGLU, ACTING IN HIS CAPACITY AS DIRECTOR OF DNI, PLOTTED TO CAUSE CAPITAL FINANCIAL HARM BY ▆▆▆▆▆▆▆▆▆▆ SO THAT HE COULD TAKEOVER CAPITAL'S HOPEWELL CAMPUS AND BUILD A ▆▆▆▆▆▆▆▆▆**

Capital's opening brief presented a brief summary of misconduct that should shock the conscience.[2] Dr. Veznedaroglu, acting in his capacity as the Director of Drexel Neurosciences Institute ("DNI"), concocted a scheme to cause Capital grave financial harm by ▆▆▆▆▆▆▆▆▆▆ See Proposed Amendment ¶ 207(b). The goal of the scheme was to cause Capital to default on the federally-backed HUD loan for its Hopewell hospital. Id. Once in default, Capital's facilities would then be purchased for pennies on the dollar to become the site for DNI's ▆▆▆▆▆▆▆▆▆▆ Id. ¶ 207(c). In furtherance of this scheme, Dr. Veznedaroglu used interstate wires to communicate numerous false and fraudulent communications to, inter alia, potential investors. Dr. Veznedaroglu and his co-conspirators even had a name for this scheme; they called the ▆▆▆▆▆▆▆▆▆▆ Id.

---

[2] Defendants argue that Capital's Proposed Amendment is based on only five documents. This, of course, is nonsense. Capital had no duty to identify and explain the significance of every document, or every piece of deposition testimony, that proves its RICO claim in either the Proposed Amendment or in its concise statement of facts in support of its motion.

2

In their opposition briefs, however, Defendants barely mention—let alone dispute—these astonishing facts. Drexel, for example, essentially concedes that Dr. Veznedaroglu was a bad actor, but claims that Drexel was unaware of his misconduct. But this is demonstrably false. In fact, Dr. Veznedaroglu's emails show that he was in direct communication with the Dean of Drexel University, John Fry, regarding this scheme. For example, in an April 21, 2016 email to a potential investor—which was written from Dr. Veznedaroglu's "drexelmed.edu" email account but was never produced by Drexel—Dr. Veznedaroglu wrote: ██████

████████████████████████████████████████

████████████████ The investor responded: ████████████████

████████████████████████████████████████

████████████████ See ECG_009888-90 (Kane Decl., Ex. A). And, notably, neither Dean Fry nor Dr. Veznedaroglu have offered any sworn denials that they discussed this plan.[3]

The GNI Defendants' response to these facts is even weaker. They do not dispute that Dr. Veznedaroglu had such a plan, or

---

[3] Astonishingly, despite emails like this clearly evidencing Drexel's knowledge of and participation in the scheme, Drexel accuses Capital of making "misrepresentations" to the Court because Capital does not blindly accept the self-serving and well-rehearsed denials that Drexel's Rule 30(b)(6) witness regurgitated on the record. In fact, ECG produced more than 12,000 pages of documents, virtually all of which were also in the possession, custody, or control of Defendants.

3

that he acted on it. Instead, they argue that because the plan failed in its ultimate goal (i.e., Capital never defaulted), there can be no violation of the law. See GNI Br. at 4 ("Since none of this ever actually happened, CHS fails to state a viable RICO claim."). The obvious problem with this argument is that even though the plan failed and Capital was never taken over, Capital was unquestionably harmed by the attempt. In fact, Capital has already served an expert report from BDO USA, LLP detailing more than $56 million in damages caused by the ▊▊▊▊▊ scheme. BDO Report (Kane Decl., Ex. B).

In other words, no one can seriously dispute that there was a plot to cripple and take over Capital. Id. ¶ 207(a)-(g). The only question before the Court now is whether Capital will be permitted to present the full panoply of applicable legal theories to the jury, or whether Defendants successfully avoided the potent deterrent remedies of RICO by wrongly concealing this plot until late in discovery.

**II. THERE IS GOOD CAUSE UNDER RULE 16 BECAUSE DEFENDANTS CONCEALED THE ▊▊▊▊▊ SCHEME UNTIL AFTER THE DEADLINE TO AMEND THE COMPLAINT, AND THE COURT ALREADY RULED THAT THERE IS GOOD CAUSE WHEN IT AMENDED THE SCHEDULING ORDER TO ALLOW DISCOVERY ON THIS ISSUE.**

Surprisingly, both Drexel and GNI argue that there is no "good cause" to allow an amendment at this time because the original deadline for amended pleadings was July 28, 2017. This is surprising because: (1) it is indisputable that Defendants

4

wrongfully concealed the ████████████████ scheme in discovery; and (2) the Court already determined that there was "good cause" pursuant to Rule 16 when it amended the scheduling order so that Capital could take discovery on these issues.

### A. Defendants Wrongfully Concealed the ████████ ████████████ Scheme in Discovery.

There can be no serious dispute that Defendants wrongfully hid the existence of the ████████████████ scheme in discovery. And, as a result, Capital did not learn about the scheme until after the deadline for amended pleadings had passed.

Here, again, Defendants have no real response to this key point. Drexel, for example, does not dispute that relevant documents were wrongly withheld, and instead points the finger at GNI as the guilty party. See Drexel Br. at 21 ("[T]he documents referenced in its subpoena to produce documents served on ECG were in the possession, custody, and control of the GNI Defendants and ECG, not Drexel."). But this is demonstrably false. There are numerous examples of relevant emails that were written to or from Dr. Veznedaroglu's "drexelmed.edu" email account **but were never produced by Drexel**. A representative (**not exhaustive**) list of examples includes:

- An April 21, 2016 email (discussed above) in which Dr. Veznedaroglu ████████████████████ ████████████████████████████ ████████████ See ECG_009888-90 (Kane Decl., Ex. A).

5

- A May 19, 2016 email that discusses possible locations for DNI's ██████████ ██████ and **specifically references** ████ ████████████████████████████████████ See ECG_009844-46 (Kane Decl., Ex. C) (emphasis added).

- A May 24, 2016 email in which Dr. Veznedaroglu reports to an investor that ████████████ ████████████████████████████████████ ████ See ECG_009595-97 (Kane Decl., Ex. D). ██████ of course, is the abbreviation for Capital's Regional Medical Center campus in Trenton.[4]

Drexel's protestations of innocence simply do not holdup in light of these examples.

The GNI Defendants, on the other hand, do not even attempt to deny that relevant documents were withheld. At one point, for example, they argue that "**some** of the documents to which CHS points…do not contain any of the search terms that the GNI Parties used to search their electronically stored information." See GNI Br. at 6 (emphasis added). But this is an admission of guilt, not an excuse. Obviously, "**some** of the documents" does not mean **all** of the documents, or even **most** of the documents.

---

[4] The Court granted additional discovery because of these emails. However, every single witness testified they could not remember which ████████████████████████████ ██████████████ Given the universal amnesia on this key point, and given that Dr. Veznedaroglu had bragged that he was discussing the plan with Dean Fry of Drexel just one month before, the jury could reasonably infer that this was a reference to Drexel's Board of Trustees—particularly since GNI, the only other entity where Dr. Veznedaroglu holds a position, does not have a board.

6

GNI has not offered—and cannot offer—any benign explanation for why relevant documents that contained designated search terms were withheld.

GNI also argues that "even if GNI did not produce some of the specific emails identified by CHS, CHS did receive from the GNI Parties documents that disclosed all of the facts that CHS contended were new." Id. This claim is also demonstrably false. GNI never produced any documents disclosing the three key elements of the ███████████████ scheme—namely, that (a) patients would be ████████████████████████████ in order to (b) cause Capital to ████████████████████ so that (c) Capital's hospital could become the site for DNI's █████ ████████████████████████████████

The most salient evidence that the key elements of the ████████████████████ scheme was not disclosed comes from the manner in which the GNI Defendants were forced to change their testimony on key issues after the ECG subpoena response. For example, in Dr. Veznedaroglu's deposition (which occurred before the ECG subpoena response) he was asked about an email in which he told his colleagues ███████████ At that time, he claimed that this email was ██████████████████████████████████ ██████████████████████████████████████████ See Veznedaroglu Dep. at 269:13-270:20 (Kane Cert, Ex. E). This dramatically changed, however, at GNI's Rule 30(b)(6) deposition (which

7

happened after the ECG subpoena response). Now, confronted with documents produced by ECG, GNI's Rule 30(b)(6) designee was forced to admit that Dr. Veznedaroglu's directive to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as part of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ scheme. See GNI 30(b)(6) Dep. at 211:12-212:15 (Kane Cert., Ex. F). Obviously, if Dr. Veznedaroglu had been forthright the first time around, Capital would have learned about the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ scheme much earlier in this case.

 Finally, it should also be noted that Defendants' failure to produce relevant documents in their possession, custody, and control is only one aspect of their concealment. As set forth in further detail in Capital's June 15, 2018 letter to the Court (which is attached as Exhibit G to the Kane Decl., and incorporated herein by reference), Defendants also gave incomplete, false, and misleading testimony. For example, in response to Capital's interrogatories, neither Drexel nor GNI identified Dean Fry as a witness with relevant information. Nor did they identify ECG, or any of the potential investors as having relevant knowledge. GNI was also asked in interrogatories to identify "all communications You have had with any third parties relating to the provision of cerebrovascular services." Id. at 4. In response, GNI neglected to mention any efforts to build a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ or any of their

8

discussions with numerous parties ▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

The evidence of Defendants' discovery misconduct is overwhelming. If Defendants had fully and accurately complied with their discovery obligations, Capital would have learned about the ▬▬▬▬▬▬▬▬▬▬ scheme early in this case, long before the deadline for amendments. This is "good cause" under Rule 16 because, obviously, Defendants should not be rewarded for their misconduct.

### B. The Court Found that There was Good Cause to Amend the Scheduling Order When it Permitted Capital to Take Additional Discovery on These Issues.

Defendants' "good cause" argument also ignores the procedural history of this case generally, and this issue specifically.

Capital first alerted the Court to Defendants' wrongful concealment of the ▬▬▬▬▬▬▬▬▬▬ scheme by letter dated June 15, 2018. See id. That letter sought a modification of the Pretrial Scheduling Order pursuant to Rule 16 so that these issues could be explored in discovery. And, notably, the letter specifically stated that the newly obtained documents "raise new claims" and, therefore, "Capital Health intends to move for leave to file an amended complaint." Id. at 5.

Defendants' response to this letter was much the same as it

9

is now. They vigorously opposed modifying the Pretrial Scheduling Order to allow for discovery on these issues. The Court then held a telephonic conference with the parties on June 22, 2018 to address these issues. At that time, the Court held—over Defendants' objections—that Capital was permitted to take discovery on the newly discovered evidence. The Court also questioned Capital's attorneys regarding the possibility of an amended pleading. In response to the Court's question, Capital's attorneys specifically revealed that an amendment asserting RICO claims was being contemplated. The Court advised that it would consider a motion for leave to amend (again, over Defendants' objections), and advised Capital to take care in filing such a motion because its legal theories would have to be fully formed in any such amendment.[5] The Court then entered a series of amended Pretrial Scheduling Orders, but none of those Orders contained new deadlines for the filing of a motion for leave to amend. Nor did Defendants ever ask for a new deadline for the filing of motions for leave to amend to be established.

Thereafter, Drexel even went so far as to oppose producing any Rule 30(b)(6) witness (even though Capital had served a Rule 30(b)(6) notice months before), arguing that it should be able

---

[5]   Notably, Drexel's Brief admits that a motion for leave to amend was discussed during this conference, and that the Court stated it would consider that motion. See Drexel Br. at 18.

10

to retroactively designate testimony of witnesses who had already been deposed as Rule 30(b)(6) testimony. On August 13, 2018, the Court held a telephone conference to address this issue. At that time, the Court specifically rejected Drexel's attempt to avoid a Rule 30(b)(6) deposition.

Given this history, it is clear that the Court (1) found "good cause" pursuant to Rule 16 to amend the Pretrial Scheduling Order when the ECG documents were first discovered; (2) specifically indicated that it would entertain a motion or leave to amend based on that discovery (and the subsequent discovery to be taken); and (3) never set a new deadline for any such motions for leave to amend to be filed.

For these reasons, the facts of this case bear some resemblance to High 5 Games, LLC v. Marks, No. 13-7161 (JMV), 2017 U.S. Dist. LEXIS 9302 (D.N.J. Jan. 24, 2017) (Falk, J.)—though the facts here are far more compelling. In High 5 Games, the plaintiff sought leave to amend its complaint after the late production of documents by defendant. Magistrate Judge Falk held that the "good cause" standard of Rule 16 did not apply because "the concept of an amended complaint was informally raised with the Court…Therefore, Defendants were clearly on notice that such a motion would be coming." Id. at *7-8. Here, too, the likelihood of an amended complaint asserting RICO claims was discussed with the Court and opposing counsel, and the Court

11

indicated that it would consider such a motion, but did not set any new deadline for the filing of such a motion. Moreover, the late production of documents in High 5 Games was routine, and was not the result of the type of obvious, yet unexplained, discovery misconduct that Defendants engaged in here.

For these reasons, there is clearly "good cause" for an amendment under Rule 16.

### III. DEFENDANTS CANNOT DEMONSTRATE ANY PREJUDICE UNDER RULE 15.

Leave to amend is to be "freely permitted" under Rule 15 "when doing so will aid in presenting the merits" and "the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits." See Fed. R. Civ. P. 15(b)(1). Notably, this liberal standard is applied throughout the proceedings: "A party may move—at any time, even after judgment—to amend the pleadings to confirm them to the evidence and to raise an unpleaded issue." See Fed. R. Civ. P. 15(b)(2).

As this Court has previously found, "[d]elay alone is not sufficient to deny a request for leave to amend." See Korrow v. Aaron's, Inc., 300 F.R.D. 215, 219 (D.N.J. 2014) (citing Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir. 1984)). Similarly, "prejudice must be 'undue' and rise to such a level that the non-moving party would be 'unfairly disadvantaged or deprived of the opportunity to present facts or evidence'." Id. Here, no

12

such undue prejudice has been established—for at least two independent reasons.

First, Defendants have been on notice throughout the final months of discovery that a RICO amendment was in the works. Indeed, even Drexel acknowledges that an amended complaint based on RICO was discussed during the June 22, 2018 conference with the Court. See Drexel Br. at 18. Since such informal notice is relevant to the more exacting Rule 16 standard, see High 5 Games, 2017 U.S. Dist. LEXIS 9302, at *7-8, it is equally relevant to the more liberal Rule 15 standard. If Defendants did not approach the final months of discovery with an eye towards the RICO amendment that Capital had already informally disclosed, they did so at their own peril.

Second, Defendants cannot identify any specific prejudice whatsoever. Drexel, for example, spends exactly one paragraph in its 31-page brief discussing the issue of prejudice. But that paragraph is completely devoid of specifics. It is boilerplate—and half-hearted boilerplate at that.

Drexel's claim that depositions would have to be re-opened, for example, is nonsense. Obviously, Capital's personnel were not aware of Defendants' unlawful scheme. Indeed, because of the Discovery Confidentiality Order in this case, Capital's executives remain ignorant of the exact details of Defendants' scheme to this day. If their depositions were re-opened to

13

explore "the elements of, and lack of support for, the RICO claims," then Capital's witnesses would have nothing to say, as all of the evidence upon which Capital is relying comes from Defendants' internal documents and admissions they were later forced to make in depositions because of those documents.

The claim that expert discovery would need to be re-opened is equally unavailing. Capital is not relying on expert testimony to establish any element of its RICO claim. Therefore, no rebuttal experts are necessary. And if Drexel's counsel could dream up some basis for an expert on the RICO claims, its opposition brief was the time to explain it.

The GNI Defendants, desperate to clothe the naked claim of prejudice, argue that the Proposed Amendment "would affect a critical change in the timing of the GNI Parties' alleged misconduct." See GNI Br. at 9. You see, the Second Amended Complaint says that Defendants' misconduct took place "[f]rom mid-2015 until February 22, 2016." Id. The Proposed Amendment, on the other hand, describes the time-period as "March 2015 until February 2016." Id.

In other words, GNI's only specific claim of prejudice is based on the distinction between "mid-2015" (in a complaint pleaded according to the notice-pleading standard of Rule 8) and "March 2015" (in a complaint pleaded according to the more exacting particularity standard of Rule 9(b)). Because of this

14

technicality, Defendants argue, they should be absolved of full responsibility for a fraudulent scheme to cause a non-profit hospital to default on a federally-backed loan so that they (and their investors) could buy it for pennies on the dollar to ███████████████████████████████████████

But the Federal Rules do not work that way. Even if there is any meaningful difference between "mid-2015" and "March 2015," that is exactly the type of amendment to conform to the evidence that Rule 15(b)(2) encourages—and specifically allows through trial and "even after judgment."

And, more importantly, the "difference" between "mid-2015" and "March 2015" has nothing whatsoever to do with Capital's Proposed Amendment. Capital has already served an expert report from BDO USA, LLP detailing more than $56 million in damages caused by the ██████████████ scheme. The RICO claim does not change those claimed damages in any way—except, of course, that RICO provides for treble damages and attorney's fees. If GNI really believes, as it claims in its brief, that Capital's damage claims conflict with the testimony of Capital Vice President Suzanne Borgos, then that is an issue for summary judgment, a Daubert motion, or trial.

## CONCLUSION

For all of the foregoing reasons, Capital's motion for leave to amend should be granted.

15

                                                **EPSTEIN BECKER & GREEN, P.C.**
Attorneys for Plaintiff
Capital Health System, Inc.

By: /s/ Thomas Kane
     ANTHONY ARGIROPOULOS
     THOMAS KANE
     SCHEHERAZADE WASTY
     150 College Road West
     Suite 301
     Princeton, NJ 088540
     (609) 455-1540

Dated: June 24, 2019